Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

# UNITED STATES DISTRICT COURT
### for the
Eastern District of Pennsylvania

|  |  |
|---|---|
| August B. Kreis IV | Case No. _____ |
| _Plaintiff(s)_ | (to be filled in by the Clerk's Office) |
| (Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.) | |
| –v– | |
| "See attached" | |
| _Defendant(s)_ | |
| (Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.) | |

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS
### (Prisoner Complaint)

---

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

---

Defendents

1 Northampton County Prison DOC

2 Jeremy Ackerman

3 Michael Grazzano

4 Charles Horvath

5 Prime Care Medical Inc.

Page 1

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

## I.    The Parties to This Complaint

### A.    The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name                                    August B. Kreis IV
All other names by which
you have been known:                    August Kreis, Byron Kreis
ID Number                               5264
Current Institution                     Northampton County Prison
Address                                 666 Walnut St.
                                        Easton          PA        18042
                                        *City*          *State*   *Zip Code*

### B.    The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. Make sure that the defendant(s) listed below are identical to those contained in the above caption. For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1
   Name                                 Northampton County Prison DOC
   Job or Title *(if known)*            Detention
   Shield Number
   Employer
   Address                              666 Walnut St.
                                        Easton          PA        18042
                                        *City*          *State*   *Zip Code*
                                        ☐ Individual capacity   ☒ Official capacity

Defendant No. 2
   Name                                 Jeremy Ackerman
   Job or Title *(if known)*            Lt.
   Shield Number                        403
   Employer                             Northampton County Prison
   Address                              666 Walnut St.
                                        Easton          PA        18042
                                        *City*          *State*   *Zip Code*
                                        ☒ Individual capacity   ☒ Official capacity

## I. Parties to this Complaint

## B. The Defendants continued

Defedant No. 5 Name: Primecare medical Inc.

Job or Title (if known): Jail medical care

Shield Number:

Employer:

Address: 3940 Locust Lane

Harrisburg                    PA                    17109
City                         State                Zip Code

[ ] Individual
    capacity

[X] official
    capacity

page. 2

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

Defendant No. 3
- Name _Michael Gazzano_
- Job or Title *(if known)* _Corrections Officer_
- Shield Number _980_
- Employer _Northampton County Prison DOC_
- Address _666 Walnut Street_
- _Easton_ _PA_ _18042_
  - City     State     Zip Code

☒ Individual capacity  ☒ Official capacity

Defendant No. 4
- Name _Charles Horvath_
- Job or Title *(if known)* _DOC Investigator_
- Shield Number _25417_
- Employer _Northampton County DOC_
- Address _666 Walnut Street_
- _Easton_ _PA_ _18042_
  - City     State     Zip Code

☒ Individual capacity  ☒ Official capacity

## II.   Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A.   Are you bringing suit against *(check all that apply)*:

☐ Federal officials (a *Bivens* claim)

☒ State or local officials (a § 1983 claim)

B.   Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]."  42 U.S.C. § 1983.  If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

(1) 14th Amendment Due Process Clause, (2) Right to express condition to... (4) 8th Amendment "cruel and unusal Punishment" (3) Due Process (2) complaints, (3) The right to "adequate" medical care/attention as needed.

C.   Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights.  If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

II. Relief - D.

1) Acting under the Pennsylvania rules/discretion vested in the warden for guidelines in detainment of individuals for criminal procecution, and State Legislature.

2) Acting in uncompliance of trained codified procedure for similar incidents with Knowledge ofinmate's with a chronic medical Disibilities.

3) Acting under complete disregard/taking advantage of regulations of codified Administration procedure for authority over inmate detainee, trained "discretion".

4) Acting in and using Pennslvaina rules of discretion vested in the warden to make their own chioce to have the authority to ignore and deny grievence within the NCP Facility, and File Commonwealth Criminal Complaint, as of PA Legislature.

5) Acting under Pennsylvania Law to provide Healthcare within a correctional Detainment Facility, as per Pennsylvania State Constitution.

Page 4

IV. Statement of Claim — B continued

(4) • In NCP following incident with Corrections Officer Michael Gazzano and writing grievance to Director Kustora

(5) • In NCP medical hallway going back to M2 housing.(incodent 1.)

• In NCP medical housing unit, after grievance was given to LPN Irranda during morning medication administration.(incodent 2.)

• Medical housing unit upon request for Distilled water for CPAP medical provision. (Incodent 3)

• Medical Housing Unit upon request for J&J COVID-19 vaccine...
(Incodent 4)

D.   Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983.  If you are suing under section 1983, explain how each defendant acted under color of state or local law.  If you are suing under *Bivens*, explain how each defendant acted under color of federal law.  Attach additional pages if needed.

"See Attached"

## III.   Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

- [X] Pretrial detainee
- [ ] Civilly committed detainee
- [ ] Immigration detainee
- [ ] Convicted and sentenced state prisoner
- [ ] Convicted and sentenced federal prisoner
- [ ] Other *(explain)* _____

## IV.   Statement of Claim

State as briefly as possible the facts of your case.  Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events.  You may wish to include further details such as the names of other persons involved in the events giving rise to your claims.  Do not cite any cases or statutes.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

A.   If the events giving rise to your claim arose outside an institution, describe where and when they arose.

B.   If the events giving rise to your claim arose in an institution, describe where and when they arose.

(1)                    (2)                         (3)
Intake at NCP, Medical in a siezure, cell H05 during search, (see attached)

IV Statement of Claim.

1) Since intake into this facility I have suffered physical abuse and lack of medical care "adequit", as well as no discretion by the corrections officials as for severe Epilepsy and severe OSA respiratory conditions. Intake on 11/9/2020

2) Lt. Jeremy Ackerman tazed me via drive taze three times after being brought to medical after blacking out into siezure. Actions while in a siezure where considered deliberate. Medical staff and Correctional Officer Andrea Kuzma were witness. Correctional Officer Andrew Kuzma was involved.

3) Correctional Officer C.E.R.T. member Michael Grazzano came into my cell angry and refused to answer "what is wrong, what did I do" upon search while searching my desk I shut the prior cabinet and asked "what is going on?" Officer Grazzano immediately stood, slamming me in the chest stating "Mother Fucker" causing pain pushing my VNS Implant and as I stummed back my head to hit the bunk. Immediately grabbing my right arm taking to the ground slamming my head into the desk. As CO Grazzano restrained my right arm, kneeling on my lower back then switched positions kneeling with right knee crouched his left leg dislodging his tazer and dropping it to the floor. Being in fear of my life with my severe Epilepsy and him slamming my head into things in "deliberate indifference" I grabbed the taser and broke it in natural action of fear of my life so it couldn't be used. At that point the C.E.R.T. members and Lt Chad Rinkenbach came being recorded on body cam. Inmates in G21 and a shadowing Corrections Officer witnessed everything, before on video recording. After this incodent being placed on "High Risk", and only recieving 3 showers between 4/12/2021 and 5/12/2021 on 4/23/2021, 5/5/21 and 5/8/21

page 5

4) Northampton County DOC refusing my grievences about mutiple incidents involving medical disability, in which no discretion was used on the handling of a situation in which severe inqury or death could have resulted by the Corrections staff abusing the authority given to them over my pressence in Northampton County Prison and the actions and the force used against me as a pretrial detainee. In which I wrote directly to DOC Director James Kustora about the incident on 4/12/2021 and the actions inside housing H05 made by Michael Crazzano #980 off of Camera recording with the shadowing Corrections Officer, resulting in DOC Investigator Charles Horvath #25427 filing a criminal Complaint to Dist. No. MDJ-03-2-06, MDJ: Hon. Daniel G. Corpe 700 Philadelphia Road Suite C, Easton, PA 18042.

5)1. Medical Administrator "Jenn Keller" giving me a grievence right back in refusal to accept stating "we did enough for you", in which was written about Correctional facility "Hippa" laws "allowing the medical Entity to disclose medical information if for the Officers saftey or the Inmates." Pertaing to my severe medical disability of Epilepsy and recieving head trama. Also able to disclose "The provision of health care to such individuals" and the dangers of certain actions used in the discretion of the Correctional facility to my life. Witnesses: Corrections Officers Lumbard #330 and Arias #840.

2. I had a siezure on the then prior date of 5/13/2021 in the morning at 930 hrs and LPN Irranda found me in the fetal position on the floor from a nocturnal siezure. Mrs. Irranda immediate notified CO McDermott #381, who then notified medical "Primecare Medical Inc." and "RN Cathy" came to the medical housing Unit to my cell M2, asked me something and left. I filed a medical grievence because, "Cathy" did nothing not even opening my cell and taking my "standard vital checks" witnessed by CO McDermott #301. I gave the grievence to LPN Irranda on her morning medication administration today, resulting in "Cathy" coming into the medical seg. Unit arguing and yelling at me about "why I was writing a grievence for her coming to the

Page 5.

IV. Statement of claim continued

5)-2 ... Medical Seg. Unit and doing "Nothing" in ex. no "Standard Vital checks". "Cathy" then stated "I was fine when she came on the scene yesterday" then stated "After all I have done for you!" I showed her and the "Primecare Medical Inc." doctor in NCP who in which followed her into the Unit a 10 year copy of my "St.Lukes Neurology Associates" medical records on details of my chronic illness but, they both walked away without reading/inspecting the details of the medical records, "Cathy" stating "I don't care." I can only compute that they believe a "chronic illness just goes away" and it is no longer their responsibility to up hold my Constitutional Right to medical care, substance in "adequate" medical care as medically needed. witnesses: CO Lumbardo #330

5)-3. Medical informed me "they have no more distilled water for life sustaining CPAP (Constant Positive Air Pressure) medical machine", established as required provision for August B. Kreis IV inmate #5264 as Health Care by St.Lukes Neurology Associates, Dr. Elizabeth De'Padua MD and, by Allyssa Bussell CRNP when inmate was taken by Deputy to the Center Valley, St.Lukes Neurology Associates and St.Lukes Hospital in FountainHill, PA. "Prime Care Medical Inc" was made well aware CPAP was vital to medical provision to negate epileptic siezures from severe Obstructive Sleep Apnea and decreased oxygenation triggering frequent nocturnal awakenings and leading to siezures by sleep deprevation.

5)-4 when vaccine which was given to other inmates in medical seg. unit was administered, I was told to give a medical request for it, I gave it to "Nicky" LPN on 2nd shift and never recieved a reply or the vaccine as of date of mailing.

Page, 5

IV. Statement

| 5) | 5/14/2021 | 1003 hrs. | -2 incodent |
| 5) | 5/16/2021 | 12:30 hrs. | -3 incident |
| 5) | 5/7/2021 | 12:00 hrs, | -4 inncident |

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

C.   What date and approximate time did the events giving rise to your claim(s) occur?

1) 11/9/2020  600 hrs  2) 12/8/2020 805 hrs  3) 4/12/2021 710 hrs

4) 4/20/2021 1500 hrs  5) 5/7/2021 900 hrs. 1(See attached)

D.   What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

"See Attached"

## V.   Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

- Bleeding from multiple drive tazes and substantial pain.
- Nerve pain in my lower back with severe pain when getting up and standing, right out of my bunk or off a chair. Physical therapy — yet to recieve.

## VI.   Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged.  Explain the basis for these claims.

$300,000.00 for pain and suffering, Abuse of life, Cruel and unresnal Punishment, and "physical punishment" on a pretrial detainee.

VII.    **Exhaustion of Administrative Remedies Administrative Procedures**

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A.      Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

☒ Yes

☐ No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Northampton County Prison

B.      Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

☒ Yes

☐ No

☐ Do not know

C.      Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

☒ Yes

☐ No

☐ Do not know

If yes, which claim(s)?

Both for DOC and Medical

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

D.   Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

☒ Yes

☐ No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

☐ Yes

☐ No

E.   If you did file a grievance:

1.   Where did you file the grievance?

Northampton County Prison

2.   What did you claim in your grievance?

that I was having a siezure when tazed / CO gazzano put me in fear of my life.

3.   What was the result, if any?

All grievences denied being told they were ungrievable

4.   What steps, if any, did you take to appeal that decision?  Is the grievance process completed?  If not, explain why not.  *(Describe all efforts to appeal to the highest level of the grievance process.)*

I took the time to use the grievance system as noted.

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

F.     If you did not file a grievance:

1.   If there are any reasons why you did not file a grievance, state them here:

_____

2.   If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

_____

G.     Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

I wrote directly to DOC directions office, stating I have my full Epilepsy condition papers.

_____

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII.   Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☒ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

_____

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

A.   Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☒ No

B.   If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.   Parties to the previous lawsuit

Plaintiff(s) _____

Defendant(s) _____

2.   Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.   Docket or index number

_____

4.   Name of Judge assigned to your case

_____

5.   Approximate date of filing lawsuit

_____

6.   Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition. _____

7.   What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

C.   Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

Pro Se 14 (Rev. 09/16) Complaint for Violation of Civil Rights (Prisoner)

☐ Yes

☒ No

D.    If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below.  *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1.  Parties to the previous lawsuit

Plaintiff(s) _____

Defendant(s) _____

2.  Court *(if federal court, name the district; if state court, name the county and State)*

_____

3.  Docket or index number

_____

4.  Name of Judge assigned to your case

_____

5.  Approximate date of filing lawsuit

_____

6.  Is the case still pending?

☐ Yes

☐ No

If no, give the approximate date of disposition _____

7.  What was the result of the case? *(For example:  Was the case dismissed?  Was judgment entered in your favor?  Was the case appealed?)*

_____

## IX.    Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A.    For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing:        5/24/2021

Signature of Plaintiff        _August B. Kreis IV_
Printed Name of Plaintiff    August B. Kreis IV
Prison Identification #       5264
Prison Address               Northampton County Prison 666 walnut St.
                             Easton            PA        18042
                             _City_           _State_     _Zip Code_

### B.    For Attorneys

Date of signing:        _____

Signature of Attorney        _____
Printed Name of Attorney     _____
Bar Number                   _____
Name of Law Firm             _____
Address                      _____
                             _____
                             _City_           _State_     _Zip Code_

Telephone Number             _____
E-mail Address               _____

# PRIMECARE
## MEDICAL +

The Choice for Quality Contract Services.
A Division of PIHS, Inc.

Log #: _____

## CONFIDENTIAL GRIEVANCE FORM

INSTRUCTIONS: Fill in all the information requested down to the dotted line in blue or black ink.

Name: _August B. Kreis IV_    Date: _5/7/2021_

Date of Birth: _2/1/1988_    Location: _Northampton County Prison_

**GRIEVANCE** (Give names of persons involved, date(s), specific location of incident or condition, and witnesses.):
A response will be given within 3 business days of receipt.

_Corrections Officer Michael Gazzaro, August B. Kreis IV_
_4/12/2021, H05, 710 hrs, Shadowing CO and inmates in_
_housing C21. Risk of serious injury or death._

**Solution Requested:**

_By Hippa law "medical information may disclosed_
_and/or told to corrections in a corrections facility if for_
_their saftey or mine"._

**INSTRUCTIONS:** Once you have completed this form, please place in medical sick call box. If you need assistance, contact your assigned treatment counselor or have your block officer contact the Health Services Administrator.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •
### *DO NOT WRITE BELOW THIS LINE*
• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

### SOLUTIONS/RECOMMENDATIONS

Date Received: _____    Date Forwarded: _____

**RESPONSE:** _____
_____
_____
_____
_____
_____

Health Services Administrator: _____

**INMATE APPEAL:**    __X__  **I do wish to appeal**    _____  **I do not wish to appeal**

Cc:  (Check all that apply)
_____ Director of Corrections          _____ Grievance File
_____ Warden
_____ Treatment Deputy
_____ PrimeCare R/A Office

White Page: Medical          Yellow Page: DOC          Pink Page: Inmate's Receipt

**Northampton County**
**Department of Corrections**

## GRIEVANCE REVIEW SYSTEM RESPONSE

TO: **Kreis, August**          **5264**          Grievance Register No. _23-2021_
      (Inmate Name)      and      (Perm No.)

      **Medical**          **02**          Date: **26 April 2021**
      (Housing Unit)      (Cell No.)

I have received your grievance and my response is as follows:

I have reviewed your grievance dated 20 April 2021 and have found it NOT GRIEVABLE. If you feel your inmate rights have been violated, you may submit a request to a shift supervisor for his/her review on their daily tour. You may also submit a request to the Institutional Investigator. If he feels your complaint is valid, he may initiate an investigation into this matter.

_____
                    (Grievance Supervisor)

_____ Inmate received a copy of this response and did not wish to appeal.

_____ Inmate given or sent a copy of appeal form (NCP Form No. NCP-l69)

White: Grievance Supervisor          Yellow: Inmate

NCP Form No. NCP-168

**Northampton County**
**Department of Corrections**

## GRIEVANCE REVIEW SYSTEM RESPONSE

TO: **Kreis, August**          **5264**        Grievance Register No. _24-2021_
　　(Inmate Name)      and      (Perm No.)

　　**Medical**                **02**         Date: **26 April 2021**
　　(Housing Unit)          (Cell No.)

I have received your grievance and my response is as follows:

I have reviewed your grievance dated 21 April 2021 and have found it NOT GRIEVABLE.  If you feel your inmate rights have been violated, you may submit a request to a shift supervisor for his/her review on their daily tour.  You may also submit a request to the Institutional Investigator.  If he feels your complaint is valid, he may initiate an investigation into this matter.

_____
(Grievance Supervisor)

_____Inmate received a copy of this response and did not wish to appeal.

_____Inmate given or sent a copy of appeal form (NCP Form No. NCP-l69)

　　　　White:  Grievance Supervisor          Yellow:  Inmate

NCP Form No. NCP-168



# COUNTY OF NORTHAMPTON

## DEPARTMENT OF CORRECTIONS

666 WALNUT STREET
EASTON, PENNSYLVANIA 18042

To: Inmate Kreis, August #5264 (MH-02)

From: Capt. David C. Collins, Sr. #4

Date: 10 May 2021

Subject: Complaints upon an officer(s)

---

Mr. Kreis,

Your complaints shared in your most recent letter have been duly noted and forwarded to the appropriate entities.


Thank you,

Capt. D. Collins, Sr. #4



# COUNTY OF NORTHAMPTON

## DEPARTMENT OF CORRECTIONS

666 WALNUT STREET
EASTON, PENNSYLVANIA 18042

**Telephone: (610) 829-7405**

**Mark T. Bartholomew**
Deputy Warden of Classification

April 27, 2021

To: August Kreis #5264

From: Mark Bartholomew., Deputy Warden of Classification

RE: Misconduct Appeal

I am writing in response to your request that your misconduct dated 4/12/2021 be reviewed and you requested to appeal your charges. I have reviewed the allegation that you put forth in this appeal. You state that Officer Gazzano slammed his own fingers in your cabinet drawer and that he responded in an inappropriate manner by using force on you to control the situation. You also state that you did indeed grab the officers Taser. This case was reviewed by the investigator and all appropriate charges were filed. During the investigation it was determined that appropriated force was used to control the situation. You also state an opinion that Officer Gazzano appeared to be acting if though he "was on meth". These are serious allegations that state an opinion and there are no facts to back your clams.

Due to the nature of your misconduct and the fact that you willfully admit to disarming a corrections officers I feel that the segregation time administered is appropriate, therefore your appeal is denied.



# COUNTY OF NORTHAMPTON

## DEPARTMENT OF CORRECTIONS

**666 WALNUT STREET
EASTON, PENNSYLVANIA 18042**

To: Inmate Kries, August #5264 (H-05)

From: Capt. David C. Collins, Sr. #4

Date: 20 April 2021

Subject: Grievance Form/Evidence

---

Mr. Kreis,

You should receive Grievance Forms before day's end, dated on the above of this letter. You are not permitted to receive any "copies of evidence" you will need to convey with your legal counsel and obtain a subpoena to obtain said items.

Thank you,

Capt. D. Collins, Sr. #4

Mark T. Bartholomew,

4/24/2021

23 - 2021
24 - 2021

The grievances in both situations must be read as written. C.O. Michael Gazzano broke procedure as soon as entering my housing unit to search and not cuffing and belting. removing me from the cell in restraint as a DS inmate. He does not need to tell me "why" or for "what" but, full restraint and removal is mandatory. I was at the gate waiting for medical procedure to be done on life sustaining medical equipment, in which video recording can see me at the gate. When given a request by medical to "search my cell" is when C.O. Michael Gazzano broke mandatory procedure, entering my cell without putting me in full restraint and removing me from my housing unit. If the Administration or any individuals say "he tried but, he refused" giving reason to forcefully enter the cell, this can be negated by the niether C.O. was even in possession of a restraint belt on video recording. Following mandatory procedure would have negated all of the situation at hand. Once in the cell off of video recording C.O. C.E.R.T. Michael Gazzano could have done ANYTHING he wanted and the written record will only be his. Saying a Corrections Officer having authority over another human life, can not be argued, that it is never taken advantage of by the Corrections Officers Discretion. In ex; a NCP Corrections Officer having sex with female inmates. While in custody of Northampton County the County is responsible for my Health, my Safety, and my well being. Just as an Officer of the Law of this Commonwealth must take "Discretion" as to the force used to reach his "Duty and Objective" before it becomes "Police Brutality", a Corrections Officer has imunity to the Law as to how much force is neccesary to do their job, while working

within the walls of this facility as per their Discretion." In which leaves that decision up to them on handling simular situations but, NO ONE IS ABOVE THE LAW. Corrections Officers are traned as to how to handle a situation with as most minimum injury to any party as possible.

— AS For my grievence for Corrections letting a gang-tag/information, which is for DOC workers to see, out to inmates and putting me in a position of physical/mental abuse and harm, I do not agree with or see how this is not grieveable. As stated above, my saftey is Northampton County's responsibility.

— My appeal to the Formal misconduct for 4/12/2021 states no where in it that he "C.O. Michael Gazzano slammed his own Fingers in a chance to injure himself with a cabinet door." He was not looking in the cabinet in which I shut, his fingers were not "Aggravatedly Assalted." Just like it is stated in the "Formal Misconduct", in which HE wrote and filed, AFTER THE TASER WAS DISLODGED, "Inmate Kreis "then" gained control of this officer's duty weapon after it became dislodged from it's holster and he refused to let the weapon go." It convienelently does not say how it became "dislodged from its holster," immediately assuming I grabbed it from the holster. Corrections Officer Michael Gazzano switched positions to kneel on my lower back with his right knee and crouch his left leg, dislodging the taser, which then dropped to the floor. I "then" grabbed it slamming it into the bunk mount and I let it go when I was drive tased by Lt. Chad Rinker #36, all of which should be on body cam video recording. With severe medical conditions, in which it only takes one siezure to die and Officer Michael Gazzano acting in "deliberate indifference", I was afraid for my life by the actions he took and slamming my head into the bunk, then desk. Abuse of human Life and the violat

ion of my "14th" A___ rights to the Due Process Clause," is something I would think your Administration would not want your Officers acting in. If noticed I signed the restitution of the taser willingly because, it is my actions in which it broke so it is my responsibility. I refused to sign the Formal Misconduct from C.O. C.E.R.T, Michael Gazzano because, that is on the side of only his alledged situation. I wrote a formal Grievence on the situation which took place in my housing unit of H05 and now I am facing a criminal complaint of Four charges to answer to. Most likely because, the Administration sees this as the ALLEDGED second time I have "Assulted" staff because, of my siezure on 12/8/2020. I am now in possession of full medical records and a Neurologist Specialist to take the stand. I Appeal ALL grievence responses from Administration denying grievence of all matters and a copy of this and all corrispondence will be Kept for Legal Purposes.

Respectfully,

August B. Kris IV

842 hrs.

*only 3 showers after 4/14/21   5/12/21*

## PERSONAL HYGIENE

Personal hygiene means keeping your body and clothes clean. It is important because you are less likely to get sick.

### HERE'S WHAT YOU CAN DO TO PRACTICE GOOD PERSONAL HYGIENE:

**WASH YOUR HANDS OFTEN:** Especially after using the restroom, before eating, after sneezing or coughing into your hands, and after touching anything dirty. Remember to use soap and water and dry your hands with a clean towel.

**BATHE OR SHOWER DAILY:** Be sure to wash all parts of your body using soap, warm water and a washcloth. Rinse and dry well, especially between your toes. Don't forget your face and ears.

**WASH YOUR HAIR REGULARLY:** If you have oily hair, you may need to wash your hair every day. Don't forget your combs and brushes need washing too.

**BRUSH YOUR TEETH:** Brush your teeth at least twice daily with a toothbrush and toothpaste. Place a sick call as soon as you feel you may be starting with a dental problem.

**STOP BODY ODOR:** Apply a deodorant/antiperspirant to clean armpits immediately after you bath or shower.

**WASH CLOTHING AND BEDDING AS OFTEN AS POSSIBLE:** Especially socks and underwear daily. If your shoes become wet or damp allow them to dry before wearing them again.

**KEEP NAILS NEAT:** Cut toenails straight across and fingernails in a rounded fashion. Don't bite your fingernails; that can lead to infection.

**DO NOT PICK AT PIMPLES:** When you notice a pimple or other mark on your skin do not pick, pop or squeeze the sore.

**NOTIFY MEDICAL IMMEDIATELY IF:** You notice a pimple or other mark on your skin become larger than normal, or drain abnormal fluid.

**WEAR SHOWER SHOES:** If at all possible wear shower shoes when taking/using the shower rooms.

## GUIDE TO QUITTING SMOKING

The US Surgeon General has stated, "Smoking cessation (stopping smoking) represents the single most important step that smokers can take to enhance the length and quality of their lives." Quitting smoking is not easy, but it can be done. To have the best chance of quitting successfully, you need to know what you're up against, what your options are, and where to go for help. This document will provide you with this information.

### Why Is It So Hard to Quit Smoking?

Mark Twain said, "Quitting smoking is easy. I've done it a thousand times." Maybe you've tried to quit too. Why is quitting and staying quit hard for so many people? The answer is nicotine.

### Nicotine

Nicotine is a drug found naturally in tobacco. It is highly addictive – as addictive as heroin or cocaine. Over time, the body becomes both physically and psychologically dependent on nicotine. Studies have shown that smokers must overcome both of these addictions to be successful at quitting and staying quit.

When smoke is inhaled, nicotine is carried deep into the lungs, where it is absorbed quickly into the bloodstream and carried throughout the body. Nicotine affects many parts of the body, including your heart and blood vessels, your hormonal system, your metabolism, and your brain. Nicotine can be found in breast milk and even in cervix mucous secretions of smokers. During pregnancy, nicotine freely crosses the placenta and has been found in amniotic fluid and the umbilical cord blood of newborn infants.

Several different factors can affect the rate of metabolism (the work of the living cell in the body) and excretion (or getting rid of the waste) related to nicotine. In general, a regular smoker will have nicotine or its by-products present in the body for about 3 to 4 days after stopping.

Nicotine produces pleasant feelings that make the smoker want to smoke more. It also acts as a kind of depressant by interfering with the flow of information between nerve cells. As the nervous system adapts to nicotine, smokers tend to increase the number of cigarettes they smoke, and therefore the amount of nicotine in their blood. After a while, the smoker develops a tolerance to the drug, which leads to an increase in smoking over time. Over time, the smoker reaches a certain nicotine level and then smokes to maintain this level of nicotine. In fact, nicotine, when inhaled in cigarette smoke, reaches the brain faster than drugs that enter the body intravenously.

### Why Quit?   Your Health

Health concerns usually top the list of reasons people give for quitting smoking. About half of all smokers who continue to smoke will end up dying from a smoking-related illness. Nearly everyone knows that smoking can cause lung cancer, but few people realize it is also a risk factor for many other kinds of cancer as well, including cancer of the mouth, voice box (larynx), throat (pharynx), esophagus, bladder, kidney, pancreas, cervix, stomach, and some leukemia. For the first time, the Surgeon General includes pneumonia in the list of diseases caused by smoking.

Smoking increases the risk of lung diseases such as emphysema and chronic bronchitis. These progressive lung diseases – grouped under the term COPD (chronic obstructive pulmonary disease) – are usually diagnosed in current or former smokers in their 60s and 70s. COPD causes chronic illness and disability and is eventually fatal.

Smokers are twice as likely to die from heart attacks as are nonsmokers. And smoking is a major risk factor for peripheral vascular disease, a narrowing of the blood vessels that carry blood to the leg and arm muscles, as well as cerebrovascular disease that can cause strokes.

Smoking also causes premature wrinkling of the skin, bad breath, bad smelling clothes and hair, and yellow fingernails and hair, yellow fingernails and an increased risk of macular



degeneration, one of the most common causes of blindness in the elderly.

For women, there are unique risks. Women over 35 who smoke and use birth control pills are in a high-risk group for heart attack, stroke, and blood clots of the legs. Women who smoke are more likely to have a miscarriage or a lower birth-weight baby. Low birth-weight babies are more likely to die or to be impaired. Based on data collected in the late 1990s, the US Centers for Disease Control (CDC) estimated that adult male smokers lost an average of 13.2 years of life and female smokers lost 14.5 years of life because of smoking.

No matter what your age or how long you've smoked, quitting will help you live longer. People who stop smoking before age 50 cut their risk of dying in the next 15 years in half compared with those who continue to smoke. Ex-smokers also enjoy a higher quality of life with fewer illnesses from cold and flu viruses, better self-reported health, and reduced rates of bronchitis and pneumonia.

Ex-smokers also enjoy a higher quality of life with fewer illnesses from cold and flu viruses, better self-reported health status, and reduced rates of bronchitis and pneumonia.

For decades the Surgeon General has reported the health risks associated with smoking. Regardless of your age or smoking history, there are advantages to quitting smoking. Benefits apply whether you are healthy or you already have smoking-related diseases. In 1990, the Surgeon General concluded:

- Quitting smoking has major and immediate health benefits for men and women of all ages. Benefits apply to people with and without smoking-related disease.

- Former smokers live longer than continuing smokers.

- Quitting smoking decreases the risk of lung cancer, other cancers, heart attack, stroke, and chronic lung disease.

- Women who stop smoking before pregnancy or during the first 3 to 4 months of pregnancy reduce their risk of having a low birth weight baby to that of women who never smoked.

- The health benefits of quitting smoking far exceed any risks from the less than 10 pound weight gain or any adverse psychological effects that may follow quitting.

### *Staying Quit (Maintenance)*

Remember the quotation by Mark Twain? Maybe you, too, have quit many times before. So you know that *staying* quit is the final, and most important, stage of the process. You can use the same methods to stay quit as you did to help you through withdrawal. Think ahead to those times when you may be tempted to smoke, and plan on how you will use alternatives and activities to cope with these situations.

### MRSA

MRSA is *Methicillin-Resistant Staphylococcus Aureus,* a potentially dangerous type of staph bacteria that is resistant to certain antibiotics and may cause skin and other infections. As with all regular staph infections, recognizing the signs and receiving treatment for MRSA skin infections in the early stages reduces the chances of the infection becoming severe. MRSA is spread by:

> Having direct contact with another person's infection

> Sharing personal items, such as towels or razors, that have touched infected skin
> Touching surfaces or items, such as used bandages, contaminated with MRSA

### *What are the signs and symptoms?*

Most staph skin infections, including MRSA, appear as a bump or infected area on the skin that may be:

> Red
> Swollen
> Painful
> Warm to the touch
> Full of pus or other drainage
> Accompanied by a fever

### *What if I suspect an MRSA skin infection?*

Cover the area with a bandage and contact your healthcare professional. It is especially important to contact your healthcare professional if signs and symptoms of an MRSA skin infection are accompanied by a fever.

### *How are MRSA skin infections treated?*

Treatment for MRSA skin infections may include having a healthcare professional drain the infection and, in some cases, prescribe an antibiotic. Do not attempt to drain the infection yourself – doing so could worsen or spread it to others. If you are given an antibiotic, be sure to take all of the doses (even if the infection is getting better), unless your healthcare professional tells you to stop taking it.

### *How can I protect my family from MRSA skin infections?*

> Know the signs of MRSA skin infections and get treated early
> Keep cuts and scrapes clean and covered
> Encourage good hygiene such as cleaning hands regularly
> Discourage sharing of personal items such as towels and razors

### DENTAL INSTRUCTIONS
### INMATE POPULATION

#### *BRUSHING*

Brush your teeth at least twice daily with a toothbrush and toothpaste. Proper brushing requires at least two minutes. Use gentle strokes and clean each side of each tooth. Pay extra attention to the gum-line, hard to reach back teeth and areas around fillings, crowns or other restorations. For fresher breath also brush your tongue.

Should you experience oral pain put in a health service request form indicating the type and location of pain. You will be seen by nursing to assist you.

#### PROCEDURE FOR MEDICAL REQUEST

1. Fill out the approved Sick Call / Medical Request Form. The Sick Call / Medical Request Forms are used for the Nurse, Doctor, Dentist and Psych.



# PRIMECARE
## MEDICAL +

The Choice for Quality Contract Services.
A Division of PIHS, Inc.

Log #: _____

## CONFIDENTIAL GRIEVANCE FORM

| INSTRUCTIONS: Fill in all the information requested down to the dotted line in blue or black ink. |
|---|

Name: _August B. Kreis IV_   Date: _11/27/2020_

Date of Birth: _2/1/1988_   Location: _H 25_

**GRIEVANCE** (Give names of persons involved, date(s), specific location of incident or condition, and witnesses.):
A response will be given within 3 business days of receipt.

_August B Kreis IV, I have been in the NCP facility since 11/08/2020 and I suffer from severe sleep apnea and epilepsy (severe). I was given a CPAP machine with no power adapter being told by CO's and inmates I am choking all night and waking up gasping. My apnea is also causing siezures._

**Solution Requested:**
_While in this facility my life is in your hands. Witnesses: Officer Doherty, Labenz, Lt. Lamont Inmate: Kenneth Austen 00-1638, Giovanni Lebron 30440, Mitchell Suarez 30445_

**INSTRUCTIONS:** Once you have completed this form, please place in medical sick call box. If you need assistance, contact your assigned treatment counselor or have your block officer contact the Health Services Administrator.

• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •
### *DO NOT WRITE BELOW THIS LINE*
• • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • • •

### SOLUTIONS/RECOMMENDATIONS

Date Received: _____   Date Forwarded: _____

**RESPONSE:** _____
_____
_____
_____
_____

Health Services Administrator: _____

**INMATE APPEAL:**   _X_   **I do wish to appeal**   _____   **I do not wish to appeal**

Cc:  (Check all that apply)
_____ Director of Corrections        _____ Grievance File
_____ Warden
_____ Treatment Deputy
_____ PrimeCare R/A Office

White Page: Medical          Yellow Page: DOC          Pink Page: Inmate's Receipt

2. Hand the nurse your medical request slip during the evening medication pass. **DO NOT** place the form on the correctional officer's desk or hand it directly to any correctional officer or trustee. This may cause a delay in processing your request. Sick Call / Medical Request Forms will be collected daily during the **Evening** medication pass.

3. If you develop an issue after the sick calls have been retrieved during the morning medication pass and the problem is in need of immediate care, notify your block officer. If the problem is not emergent in nature, please submit the request before the evening and hand to the nurse.

## INFLUENZA (FLU) FACTS

H1N1 flu (sometimes called "swine flu") is a new influenza virus that is spreading worldwide among people. Because this virus is very different from current seasonal influenza viruses, many people will not have protective immunity against it and the seasonal flu vaccine will not protect against it either. Influenza is unpredictable, but this flu season could be worse than recent years because of the H1N1 virus. CDC is preparing for an early flu season and expects both H1N1 flu and seasonal flu to cause illness, hospital stays and deaths this season.

### How does H1N1 flu spread?
Both H1N1 flu and seasonal influenza are thought to spread mostly from person to person through the coughs and sneezes of people who are sick with influenza. People also may get sick by touching something with flu viruses on it, and then touching their mouth or nose.

### How long can a sick person spread H1N1 flu to others?
People infected with H1N1 flu shed virus and may be able to infect others from 1 day before getting sick to about 7 days after getting sick. This can be longer in some people, especially children and people with weakened immune systems.

### How severe is illness associated with this H1N1 flu virus?
H1N1 flu illness has ranged from mild to severe. Most healthy people who have been sick with H1N1 have recovered without needing medical treatment; however, hospitalizations and deaths from H1N1 have occurred. Most people who have been hospitalized with H1N1 have had a medical condition that places them at higher risk of serious flu-related complications. However, some people who have become very ill have been previously healthy. Severe infections have been reported among people of all ages. While few people over the age of 65 have been infected with this new virus, if people in this age group become ill, they are at higher risk of developing flu-related complications.

### What can I do to protect myself from getting sick from H1N1 flu?

PrimeCare Medical, Inc. – September 2018

CDC recommends a three-step approach to fighting the flu: vaccination, everyday preventive actions including frequent hand washing and staying home when sick, and the correct use of antiviral drugs if your doctor recommends them.

A vaccine against H1N1 flu is being produced. To protect those at greatest risk of H1N1, CDC recommends that certain people get the H1N1 flu vaccine first when it becomes available. These key groups include people who are at higher risk of getting sick or having serious flu complications, those who are likely to come in contact with H1N1.

Everyday actions can help prevent the spread of germs that cause respiratory illnesses like influenza.

Cover your nose and mouth with a tissue when you cough or sneeze. (Throw the tissue in the trash after you use it.)

Wash your hands often with soap and water. If soap and water are not available, use an alcohol-based hand rub.

Avoid touching your eyes, nose and mouth. Germs spread this way.

Try to avoid close contact with sick people.

### Flu symptoms can include
- fever
- cough
- sore throat
- runny or stuffy nose
- body aches
- headache
- chills
- fatigue
- sometimes diarrhea
- vomiting

### If You Get Sick
### What should I do if I get sick?
If you become ill with influenza-like symptoms this flu season you should stay home and avoid contact with other people except to seek medical care. Most people have been able to recover at home from 2009 H1N1 without needing medical care and the same is true of seasonal flu.

However, some people are at high risk of serious flu-related complications.

People 65 and older

Pregnant women

People who have:
- Cancer
- Blood disorders (including sickle cell disease)
- Chronic lung disease [including asthma or chronic obstructive pulmonary disease (COPD)]
- Diabetes
- Heart disease
- Kidney disorders
- Liver disorders
- Neurological disorders (including nervous system, brain or spinal cord)

## Fetal Alcohol Exposure (FAE)/ Fetal Alcohol Syndrome (FAS)

Alcohol is toxic to a baby's developing brain and is the cause of multiple birth defects when exposed during the pre-natal period (FAE). The brain is the most sensitive organ to alcohol damage.

Fetal Alcohol Syndrome (FAS) is the most widely recognized effect of alcohol consumption during pregnancy. FAS is the leading known preventable cause of mental retardation.

Damage occurs during each trimester and the system affected depends on which area of the brain is developing at that time:

**First Trimester** (formation and organization of brain cells):
Mental Retardation
Miscarriage or stillbirth
Premature delivery
Slow growth and poor coordination after birth

**Second Trimester** (physical features and development):
Abnormal heart structure
Narrow, small eyes
Small head and upper jaw
Cleft lip and/or cleft palate
Hydrocephalus (fluid on the brain)
Spina Bifida (abnormal spinal cord development)

**Third Trimester** (vision, hearing, fine motor skills, behavior)
Poor reading and math skills
Poor decision making ability and poor judgment
Behavior problems: impulsive, emotionally immature, ADHD
Require protection and close supervision for life

Avoiding alcohol during pregnancy prevents Fetal Alcohol Syndrome (FAS).

No amount of alcohol has been proven safe during pregnancy.

## County Prison Mental Health
## Tips and Information for Residents

Feeling depressed, lonely, scared, without much hope for change? For many people, these feelings may be due to incarceration, loss of a family member, the break-up of a close relationship, or any number of other important reasons.

Many people experience the following when they are incarcerated:

- Sadness
- Loneliness
- Worry
- Anger
- Sleep trouble
- Appetite changes
- Missing friends, family, or home
- Desire for drugs or alcohol

PrimeCare Medical, Inc. – September 2018

- Fear

These feelings are completely normal and some adjustment trouble is also normal. **Thoughts of wanting to hurt yourself, die, or hurt someone else are not normal.**

**HOW TO RECOGNIZE A CRISIS:**
People in crisis may have already tried everything they can think of to solve their problem but nothing seems to work. They may begin to feel hopeless and inadequate. This can be frightening and some people will do anything to escape, even suicide.

**CLUES SOMEONE IS SUICIDAL**
People find many ways of telling others how much they are hurting. The following statements can be clues someone is at RISK:

Statements or Thoughts:
- I can't take it anymore.
- It won't matter soon.
- I'm no good anyway.
- My family would be better off without me.
- People will be sorry when I'm gone.

Behaviors of people who may be suicidal:
- not taking care of health or appearance
- always tired, not getting out of bed
- isolating from other people
- sudden edginess or restlessness
- talking of dying or death
- cutting, scratching, or burning self
- hoarding medication
- giving away prized possessions

What you can do for yourself:
- Tell an officer immediately if you are having thoughts of self harm or worried about yourself.

What you can do for others:
- Immediately tell an officer.

**\*\*\*\*People are not punished for being suicidal. People who are suicidal get help and are kept safe until they can return to general population\*\*\*\***

How to access mental health services at County Prison:

- If it is not an emergency, fill out a sick call slip and return to the sick call slip box on your block.
- Be sure to be specific and detailed about your concern and/or request so you can get the right help as quickly as possible.
- First, you will be seen by the Medical Staff who will evaluate you and make referrals to the Mental Health Provider.
-

**IF YOU ARE HAVING AN EMERGENCY**

45 CFR § 164.512 – Uses and disclosures for which an authorization or opportunity to agree or object is not required.

*Pertinent information on page 13.*

**§ 164.512 Uses and disclosures for which an authorization or opportunity to agree or object is not required.**

A covered entity may use or disclose protected health information without the written authorization of the individual, as described in § 164.508, or the opportunity for the individual to agree or object as described in § 164.510, in the situations covered by this section, subject to the applicable requirements of this section. When the covered entity is required by this section to inform the individual of, or when the individual may agree to, a use or disclosure permitted by this section, the covered entity's information and the individual's agreement may be given orally.

**(a) Standard: Uses and disclosures required by law.**

**(1)** A covered entity may use or disclose protected health information to the extent that such use or disclosure is required by law and the use or disclosure complies with and is limited to the relevant requirements of such law.

**(2)** A covered entity must meet the requirements described in paragraph (c), (e), or (f) of this section for uses or disclosures required by law.

**(b) Standard: Uses and disclosures for public health activities** –

**(1)** *Permitted uses and disclosures.* A covered entity may use or disclose protected health information for the public health activities and purposes described in this paragraph to:

**(i)** A public health authority that is authorized by law to collect or receive such information for the purpose of preventing or controlling disease, injury, or disability, including, but not limited to, the reporting of disease, injury, vital events such as birth or death, and the conduct of public health surveillance, public health investigations, and public health interventions; or, at the direction of a public health authority, to an official of a foreign government agency that is acting in collaboration with a public health authority;

**(ii)** A public health authority or other appropriate government authority authorized by law to receive reports of child abuse or neglect;

**(iii)** A person subject to the jurisdiction of the Food and Drug Administration (FDA) with respect to an FDA-regulated product or activity for which that person has responsibility, for the purpose of activities related to the quality, safety or effectiveness of such FDA-regulated product or activity. Such purposes include:

**(A)** To collect or report adverse events (or similar activities with respect to food or dietary supplements), product defects or problems (including problems with the use or labeling of a product), or biological product deviations;

**(B)** To track FDA-regulated products;

**(C)** To enable product recalls, repairs, or replacement, or lookback (including locating and notifying individuals who have received products that have been recalled, withdrawn, or are the subject of lookback); or

**(D)** To conduct post marketing surveillance;

**(iv)** A person who may have been exposed to a communicable disease or may otherwise be at risk of contracting or spreading a disease or condition, if the covered entity or public health authority is authorized by law to notify such person as necessary in the conduct of a public health intervention or investigation; or

**(v)** An employer, about an individual who is a member of the workforce of the employer, if:

**(A)** The covered entity is a covered health care provider who provides health care to the individual at the request of the employer:

**(1)** To conduct an evaluation relating to medical surveillance of the workplace; or

**(2)** To evaluate whether the individual has a work-related illness or injury;

**(B)** The protected health information that is disclosed consists of findings concerning a work-related illness or injury or a workplace-related medical surveillance;

**(C)** The employer needs such findings in order to comply with its obligations, under 29 CFR parts 1904 through 1928, 30 CFR parts 50 through 90, or under state law having a similar purpose, to record such illness or injury or to carry out responsibilities for workplace medical surveillance; and

**(D)** The covered health care provider provides written notice to the individual that protected health information relating to the medical surveillance of the workplace and work-related illnesses and injuries is disclosed to the employer:

**(1)** By giving a copy of the notice to the individual at the time the health care is provided; or

**(2)** If the health care is provided on the work site of the employer, by posting the notice in a prominent place at the location where the health care is provided.

**(vi)** A school, about an individual who is a student or prospective student of the school, if:

**(A)** The protected health information that is disclosed is limited to proof of immunization;

**(B)** The school is required by State or other law to have such proof of immunization prior to admitting the individual; and

**(C)** The covered entity obtains and documents the agreement to the disclosure from either:

**(1)** A parent, guardian, or other person acting *in loco parentis* of the individual, if the individual is an unemancipated minor; or

**(2)** The individual, if the individual is an adult or emancipated minor; or

**(2)** *Permitted uses.* If the covered entity also is a public health authority, the covered entity is permitted to use protected health information in all cases in

which it is permitted to disclose such information for public health activities under paragraph (b)(1) of this section.

**(c) Standard: Disclosures about victims of abuse, neglect or domestic violence** -

**(1) Permitted disclosures.** Except for reports of child abuse or neglect permitted by paragraph (b)(1)(ii) of this section, a covered entity may disclose protected health information about an individual whom the covered entity reasonably believes to be a victim of abuse, neglect, or domestic violence to a government authority, including a social service or protective services agency, authorized by law to receive reports of such abuse, neglect, or domestic violence:

(I) To the extent the disclosure is required by law and the disclosure complies with and is limited to the relevant requirements of such law;

(II) If the individual agrees to the disclosure; or

(III) To the extent the disclosure is expressly authorized by statute or regulation and:

(A) The covered entity, in the exercise of professional judgment, believes the disclosure is necessary to prevent serious harm to the individual or other potential victims; or

(B) If the individual is unable to agree because of incapacity, a law enforcement or other public official authorized to receive the report represents that the protected health information for which disclosure is sought is not intended to be used against the individual and that an immediate enforcement activity that depends upon the disclosure would be materially and adversely affected by waiting until the individual is able to agree to the disclosure.

**(2) Informing the individual.** A covered entity that makes a disclosure permitted by paragraph (c)(1) of this section must promptly inform the individual that such a report has been or will be made, except if:

(I) The covered entity, in the exercise of professional judgment, believes informing the individual would place the individual at risk of serious harm; or

(II) The covered entity would be informing a personal representative, and the covered entity reasonably believes the personal representative is responsible for the abuse, neglect, or other injury, and that informing such person would not be in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment.

**(d) Standard: Uses and disclosures for health oversight activities** -

**(1) Permitted disclosures.** A covered entity may disclose protected health information to a health oversight agency for oversight activities authorized by law, including audits; civil, administrative, or criminal investigations; inspections; licensure or disciplinary actions; civil, administrative, or criminal proceedings or actions; or other activities necessary for appropriate oversight of:

(I) The health care system;

(II) Government benefit programs for which health information is relevant to beneficiary eligibility;

(III) Entities subject to government regulatory programs for which health information is necessary for determining compliance with program standards; or

(IV) Entities subject to civil rights laws for which health information is necessary for determining compliance.

**(2) Exception to health oversight activities.** For the purpose of the disclosures permitted by paragraph (d)(1) of this section, a health oversight activity does not include an investigation or other activity in which the individual is the subject of the investigation or activity and such investigation or other activity does not arise out of and is not directly related to:

(I) The receipt of health care;

(II) A claim for public benefits related to health; or

(III) Qualification for, or receipt of, public benefits or services when a patient's health is integral to the claim for public benefits or services.

**(3) Joint activities or investigations.** Notwithstanding paragraph (d)(2) of this section, if a health oversight activity or investigation is conducted in conjunction with an oversight activity or investigation relating to a claim for public benefits not related to health, the joint activity or investigation is considered a health oversight activity for purposes of paragraph (d) of this section.

**(4) Permitted uses.** If a covered entity also is a health oversight agency, the covered entity may use protected health information for health oversight activities as permitted by paragraph (d) of this section.

**(e) Standard: Disclosures for judicial and administrative proceedings** -

**(1) Permitted disclosures.** A covered entity may disclose protected health information in the course of any judicial or administrative proceeding:

(I) In response to an order of a court or administrative tribunal, provided that the covered entity discloses only the protected health information expressly authorized by such order; or

(II) In response to a subpoena, discovery request, or other lawful process, that is not accompanied by an order of a court or administrative tribunal, if:

(A) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iii) of this section, from the party seeking the information that reasonable efforts have been made by such party to ensure that the individual who is the subject of the protected health information that has been requested has been given notice of the request; or

(B) The covered entity receives satisfactory assurance, as described in paragraph (e)(1)(iv) of this section, from the party seeking the information that reasonable efforts have been made by such party to secure a qualified protective order that meets the requirements of paragraph (e)(1)(v) of this section.

(iii) For the purposes of paragraph (e)(1)(i)(A) of this section, a covered entity receives satisfactory assurances from a party seeking protected health information if the covered entity receives from such party a written statement and accompanying documentation demonstrating that:

(A) The party requesting such information has made a good faith attempt to provide written notice to the individual (or, if the individual's location is unknown, to mail a notice to the individual's last known address);

(B) The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court or administrative tribunal; and

(C) The time for the individual to raise objections to the court or administrative tribunal has elapsed, and:

(1) No objections were filed; or

(2) All objections filed by the individual have been resolved by the court or the administrative tribunal and the disclosures being sought are consistent with such resolution.

(iv) For the purposes of paragraph (e)(1)(i)(B) of this section, a covered entity receives satisfactory assurances from a party seeking protected health information, if the covered entity receives from such party a written statement and accompanying documentation demonstrating that:

(A) The parties to the dispute giving rise to the request for information have agreed to a qualified protective order and have presented it to the court or administrative tribunal with jurisdiction over the dispute; or

(B) The party seeking the protected health information has requested a qualified protective order from such court or administrative tribunal.

(v) For purposes of paragraph (e)(1) of this section, a qualified protective order means, with respect to protected health information requested under paragraph (e)(1)(ii) of this section, an order of a court or of an administrative tribunal or a stipulation by the parties to the litigation or administrative proceeding that:

(A) Prohibits the parties from using or disclosing the protected health information for any purpose other than the litigation or proceeding for which such information was requested; and

(B) Requires the return to the covered entity or destruction of the protected health information (including all copies made) at the end of the litigation or proceeding.

(vi) Notwithstanding paragraph (e)(1)(ii) of this section, a covered entity may disclose protected health information in response to lawful process described in paragraph (e)(1)(ii) of this section without receiving satisfactory assurance under paragraph (e)(1)(ii)(A) or (B) of this section, if the covered entity makes reasonable efforts to provide notice to the individual sufficient to meet the requirements of paragraph (e)(1)(iii) of this section or to seek a qualified protective order sufficient to meet the requirements of paragraph (e)(1)(v) of this section.

(2) *Other uses and disclosures under this section.* The provisions of this paragraph do not supersede other provisions of this section that otherwise permit or restrict uses or disclosures of protected health information.

(f) *Standard: Disclosures for law enforcement purposes.* A covered entity may disclose protected health information for a law enforcement purpose to a law enforcement official if the conditions in paragraphs (f)(1) through (f)(6) of this section are met, as applicable.

(1) *Permitted disclosures: Pursuant to process and as otherwise required by law.* A covered entity may disclose protected health information:

(i) As required by law including laws that require the reporting of certain types of wounds or other physical injuries, except for laws subject to paragraph (b)(1)(ii) or (c)(1)(i) of this section; or

(ii) In compliance with and as limited by the relevant requirements of:

(A) A court order or court-ordered warrant, or a subpoena or summons issued by a judicial officer;

(B) A grand jury subpoena; or

(C) An administrative request, including an administrative subpoena or summons, a civil or an authorized investigative demand, or similar process authorized under law, provided that:

(1) The information sought is relevant and material to a legitimate law enforcement inquiry;

(2) The request is specific and limited in scope to the extent reasonably practicable in light of the purpose for which the information is sought; and

(3) De-identified information could not reasonably be used.

(2) *Permitted disclosures: Limited information for identification and location purposes.* Except for disclosures required by law as permitted by paragraph (f)(1) of this section, a covered entity may disclose protected health information in response to a law enforcement official's request for such information for the purpose of identifying or locating a suspect, fugitive, material witness, or missing person, provided that:

(i) The covered entity may disclose only the following information:

(A) Name and address;

(B) Date and place of birth;

(C) Social security number;

(D) ABO blood type and rh factor;

(E) Type of injury;

(F) Date and time of treatment;

(G) Date and time of death, if applicable; and

**(H)** A description of distinguishing physical characteristics, including height, weight, gender, race, hair and eye color, presence or absence of facial hair (beard or moustache), scars, and tattoos.

**(ii)** Except as permitted by paragraph (f)(2)(i) of this section, the covered entity may not disclose for the purposes of identification or location under paragraph (f)(2) of this section any protected health information related to the individual's DNA or DNA analysis, dental records, or typing, samples or analysis of body fluids or tissue.

**(3)** *Permitted disclosure: Victims of a crime.* Except for disclosures required by law as permitted by paragraph (f)(1) of this section, a covered entity may disclose protected health information in response to a law enforcement official's request for such information about an individual who is or is suspected to be a victim of a crime, other than disclosures that are subject to paragraph (b) or (c) of this section, if:

**(i)** The individual agrees to the disclosure; or

**(ii)** The covered entity is unable to obtain the individual's agreement because of incapacity or other emergency circumstance, provided that:

**(A)** The law enforcement official represents that such information is needed to determine whether a violation of law by a person other than the victim has occurred, and such information is not intended to be used against the victim;

**(B)** The law enforcement official represents that immediate law enforcement activity that depends upon the disclosure would be materially and adversely affected by waiting until the individual is able to agree to the disclosure; and

**(C)** The disclosure is in the best interests of the individual as determined by the covered entity, in the exercise of professional judgment.

**(4)** *Permitted disclosure: Decedents.* A covered entity may disclose protected health information about an individual who has died to a law enforcement official for the purpose of alerting law enforcement of the death of the individual if the covered entity has a suspicion that such death may have resulted from criminal conduct.

**(5)** *Permitted disclosure: Crime on premises.* A covered entity may disclose to a law enforcement official protected health information that the covered entity believes in good faith constitutes evidence of criminal conduct that occurred on the premises of the covered entity.

**(6)** *Permitted disclosure: Reporting crime in emergencies.*

**(i)** A covered health care provider providing emergency health care in response to a medical emergency, other than such emergency on the premises of the covered health care provider, may disclose protected health information to a law enforcement official if such disclosure appears necessary to alert law enforcement to:

**(A)** The commission and nature of a crime;

**(B)** The location of such crime or of the victim(s) of such crime; and

**(C)** The identity, description, and location of the perpetrator of such crime.

**(ii)** If a covered health care provider believes that the medical emergency described in paragraph (f)(6)(i) of this section is the result of abuse, neglect, or domestic violence of the individual in need of emergency health care, paragraph (f)(6)(i) of this section does not apply and any disclosure to a law enforcement official for law enforcement purposes is subject to paragraph (c) of this section.

**(g)** *Standard: Uses and disclosures about decedents* –

**(1)** *Coroners and medical examiners.* A covered entity may disclose protected health information to a coroner or medical examiner for the purpose of identifying a deceased person, determining a cause of death, or other duties as authorized by law. A covered entity that also performs the duties of a coroner or medical examiner may use protected health information for the purposes described in this paragraph.

**(2)** *Funeral directors.* A covered entity may disclose protected health information to funeral directors, consistent with applicable law, as necessary to carry out their duties with respect to the decedent. If necessary for funeral directors to carry out their duties, the covered entity may disclose the protected health information prior to, and in reasonable anticipation of, the individual's death.

**(h)** *Standard: Uses and disclosures for cadaveric organ, eye or tissue donation purposes.* A covered entity may use or disclose protected health information to organ procurement organizations or other entities engaged in the procurement, banking, or transplantation of cadaveric organs, eyes, or tissue for the purpose of facilitating organ, eye or tissue donation and transplantation.

**(i)** *Standard: Uses and disclosures for research purposes* -

**(1)** *Permitted uses and disclosures.* A covered entity may use or disclose protected health information for research, regardless of the source of funding of the research, provided that:

**(i)** *Board approval of a waiver of authorization.* The covered entity obtains documentation that an alteration to or waiver, in whole or in part, of the individual authorization required by § 164.508 for use or disclosure of protected health information has been approved by either:

**(A)** An Institutional Review Board (IRB), established in accordance with 7 CFR lc.107, 10 CFR 745.107, 14 CFR 1230.107, 15 CFR 27.107, 16 CFR 1028.107, 21 CFR 56.107, 22 CFR 225.107, 24 CFR 60.107, 28 CFR 46.107, 32 CFR 219.107, 34 CFR 97.107, 38 CFR 16.107, 40 CFR 26.107, 45 CFR 46.107, 45 CFR 690.107, or 49 CFR 11.107; or

**(B)** A privacy board that:

**(1)** Has members with varying backgrounds and appropriate professional competency as necessary to review the effect of the research protocol on the individual's privacy rights and related interests;

**(2)** Includes at least one member who is not affiliated with the covered entity, not affiliated with any entity conducting or sponsoring the research, and not related to any person who is affiliated with any of such entities; and

(3) Does not have any member participating in a review of any project in which the member has a conflict of interest.

(ii) *Reviews preparatory to research.* The covered entity obtains from the researcher representations that:

(A) Use or disclosure is sought solely to review protected health information as necessary to prepare a research protocol or for similar purposes preparatory to research;

(B) No protected health information is to be removed from the covered entity by the researcher in the course of the review; and

(C) The protected health information for which use or access is sought is necessary for the research purposes.

(iii) *Research on decedent's information.* The covered entity obtains from the researcher:

(A) Representation that the use or disclosure sought is solely for research on the protected health information of decedents;

(B) Documentation, at the request of the covered entity, of the death of such individuals; and

(C) Representation that the protected health information for which use or disclosure is sought is necessary for the research purposes.

(2) *Documentation of waiver approval.* For a use or disclosure to be permitted based on documentation of approval of an alteration or waiver, under paragraph (i)(1)(i) of this section, the documentation must include all of the following:

(i) *Identification and date of action.* A statement identifying the IRB or privacy board and the date on which the alteration or waiver of authorization was approved;

(ii) *Waiver criteria.* A statement that the IRB or privacy board has determined that the alteration or waiver, in whole or in part, of authorization satisfies the following criteria:

(A) The use or disclosure of protected health information involves no more than a minimal risk to the privacy of individuals, based on, at least, the presence of the following elements:

(1) An adequate plan to protect the identifiers from improper use and disclosure;

(2) An adequate plan to destroy the identifiers at the earliest opportunity consistent with conduct of the research, unless there is a health or research justification for retaining the identifiers or such retention is otherwise required by law; and

(3) Adequate written assurances that the protected health information will not be reused or disclosed to any other person or entity, except as required by law, for authorized oversight of the research study, or for other research for which

the use or disclosure of protected health information would be permitted by this subpart;

(B) The research could not practicably be conducted without the waiver or alteration; and

(C) The research could not practicably be conducted without access to and use of the protected health information.

(iii) *Protected health information needed.* A brief description of the protected health information for which use or access has been determined to be necessary by the institutional review board or privacy board, pursuant to paragraph (i)(2)(ii)(C) of this section;

(iv) *Review and approval procedures.* A statement that the alteration or waiver of authorization has been reviewed and approved under either normal or expedited review procedures, as follows:

(A) An IRB must follow the requirements of the Common Rule, including the normal review procedures (7 CFR 1c.108(d), 10 CFR 745.108(d), 14 CFR 1230.108(d), 15 CFR 27.108(d), 16 CFR 1028.108(d), 21 CFR 56.108(b), 22 CFR 225.108(d), 24 CFR 60.108(d), 28 CFR 46.108(d), 32 CFR 219.108(b), 34 CFR 97.108(b), 38 CFR 16.108(b), 40 CFR 26.108(b), 45 CFR 46.108(b), 45 CFR 690.108(b), or 49 CFR 11.108(b)) or the expedited review procedures (7 CFR 1c.110, 10 CFR 745.110, 14 CFR 1230.110, 15 CFR 27.110, 16 CFR 1028.110, 21 CFR 56.110, 22 CFR 225.110, 24 CFR 60.110, 28 CFR 46.110, 32 CFR 219.110, 34 CFR 97.110, 38 CFR 16.110, 40 CFR 26.110, 45 CFR 46.110, 45 CFR 690.110, or 49 CFR 11.110));

(B) A privacy board must review the proposed research at convened meetings at which a majority of the privacy board members are present, including at least one member who satisfies the criterion stated in paragraph (i)(1)(i)(B)(2) of this section, and the alteration or waiver of authorization must be approved by the majority of the privacy board members present at the meeting, unless the privacy board elects to use an expedited review procedure in accordance with paragraph (i)(2)(iv)(C) of this section;

(C) A privacy board may use an expedited review procedure if the research involves no more than minimal risk to the privacy of the individuals who are the subject of the protected health information for which use or disclosure is being sought. If the privacy board elects to use an expedited review procedure, the review and approval of the alteration or waiver of authorization may be carried out by the chair of the privacy board, or by one or more members of the privacy board as designated by the chair; and

(v) *Required signature.* The documentation of the alteration or waiver of authorization must be signed by the chair or other member, as designated by the chair, of the IRB or the privacy board, as applicable.

(j) *Standard: Uses and disclosures to avert a serious threat to health or safety* -

(1) **Permitted disclosures.** A covered entity may, consistent with applicable law and standards of ethical conduct, use or disclose protected health information, if the covered entity, in good faith, believes the use or disclosure:

(i)

(A) Is necessary to prevent or lessen a serious and imminent threat to the health or safety of a person or the public; and

(B) Is to a person or persons reasonably able to prevent or lessen the threat, including the target of the threat; or

(ii) Is necessary for law enforcement authorities to identify or apprehend an individual:

(A) Because of a statement by an individual admitting participation in a violent crime that the covered entity reasonably believes may have caused serious physical harm to the victim; or

(B) Where it appears from all the circumstances that the individual has escaped from a correctional institution or from lawful custody, as those terms are defined in § 164.501.

(2) **Use or disclosure not permitted.** A use or disclosure pursuant to paragraph (j)(1)(ii)(A) of this section may not be made if the information described in paragraph (j)(1)(ii)(A) of this section is learned by the covered entity:

(i) In the course of treatment to affect the propensity to commit the criminal conduct that is the basis for the disclosure under paragraph (j)(1)(ii)(A) of this section, or counseling or therapy; or

(ii) Through a request by the individual to initiate or to be referred for the treatment, counseling, or therapy described in paragraph (j)(2)(i) of this section.

(3) **Limit on information that may be disclosed.** A disclosure made pursuant to paragraph (j)(1)(ii)(A) of this section shall contain only the statement described in paragraph (j)(1)(ii)(A) of this section and the protected health information described in paragraph (f)(2)(i) of this section.

(4) **Presumption of good faith belief.** A covered entity that uses or discloses protected health information pursuant to paragraph (j)(1) of this section is presumed to have acted in good faith with regard to a belief described in paragraph (j)(1)(i) or (ii) of this section, if the belief is based upon the covered entity's actual knowledge or in reliance on a credible representation by a person with apparent knowledge or authority.

(k) **Standard: Uses and disclosures for specialized government functions** -

(1) **Military and veterans activities** -

(i) **Armed Forces personnel.** A covered entity may use and disclose the protected health information of individuals who are Armed Forces personnel for activities deemed necessary by appropriate military command authorities to assure the proper execution of the military mission, if the appropriate military authority has published by notice in the FEDERAL REGISTER the following information:

(A) Appropriate military command authorities; and

(B) The purposes for which the protected health information may be used or disclosed.

(ii) **Separation or discharge from military service.** A covered entity that is a component of the Departments of Defense or Homeland Security may disclose to the Department of Veterans Affairs (DVA) the protected health information of an individual who is a member of the Armed Forces upon the separation or discharge of the individual from military service for the purpose of a determination by DVA of the individual's eligibility for or entitlement to benefits under laws administered by the Secretary of Veterans Affairs.

(iii) **Veterans.** A covered entity that is a component of the Department of Veterans Affairs may use and disclose protected health information to components of the Department that determine eligibility for or entitlement to, or that provide, benefits under the laws administered by the Secretary of Veterans Affairs.

(iv) **Foreign military personnel.** A covered entity may use and disclose the protected health information of individuals who are foreign military personnel to their appropriate foreign military authority for the same purposes for which uses and disclosures are permitted for Armed Forces personnel under the notice published in the FEDERAL REGISTER pursuant to paragraph (k)(1)(i) of this section.

(2) **National security and intelligence activities.** A covered entity may disclose protected health information to authorized federal officials for the conduct of lawful intelligence, counter-intelligence, and other national security activities authorized by the National Security Act (50 U.S.C. 401, et seq.) and implementing authority (e.g., Executive Order 12333).

(3) **Protective services for the President and others.** A covered entity may disclose protected health information to authorized Federal officials for the provision of protective services to the President or other persons authorized by 18 U.S.C. 3056 or to foreign heads of state or other persons authorized by 22 U.S.C. 2709(a)(3), or for the conduct of investigations authorized by 18 U.S.C. 871 and 879.

(4) **Medical suitability determinations.** A covered entity that is a component of the Department of State may use protected health information to make medical suitability determinations and may disclose whether or not the individual was determined to be medically suitable to the officials in the Department of State who need access to such information for the following purposes:

(I) For the purpose of a required security clearance conducted pursuant to Executive Orders 10450 and 12968;

(II) As necessary to determine worldwide availability or availability for mandatory service abroad under sections 101(a)(4) and 504 of the Foreign Service Act; or

(III) For a family to accompany a Foreign Service member abroad, consistent with section 101(b)(5) and 904 of the Foreign Service Act.

(5) **Correctional institutions and other law enforcement custodial situations** -

(i) **Permitted disclosures.** A covered entity may disclose to a correctional institution or a law enforcement official having lawful custody of an inmate or other individual protected health information about such inmate or individual, if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

(A) The provision of health care to such individuals;

(B) The health and safety of such individual or other inmates;

(C) The health and safety of the officers or employees of or others at the correctional institution;

(D) The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;

(E) Law enforcement on the premises of the correctional institution; or

(F) The administration and maintenance of the safety, security, and good order of the correctional institution.

(ii) **Permitted uses.** A covered entity that is a correctional institution may use protected health information of individuals who are inmates for any purpose for which such protected health information may be disclosed.

(iii) **No application after release.** For the purposes of this provision, an individual is no longer an inmate when released on parole, probation, supervised release, or otherwise is no longer in lawful custody.

(6) *Covered entities that are government programs providing public benefits.*

(i) A health plan that is a government program providing public benefits may disclose protected health information relating to eligibility for or enrollment in the health plan to another agency administering a government program providing public benefits if the sharing of eligibility or enrollment information among such government agencies or the maintenance of such information in a single or combined data system accessible to all such government agencies is required or expressly authorized by statute or regulation.

(ii) A covered entity that is a government agency administering a government program providing public benefits may disclose protected health information relating to the program to another covered entity that is a government agency administering a government program providing public benefits if the programs serve the same or similar populations and the disclosure of protected health information is necessary to coordinate the covered functions of such programs or to improve administration and management relating to the covered functions of such programs.

(7) *National Instant Criminal Background Check System.* A covered entity may use or disclose protected health information for purposes of reporting to the National Instant Criminal Background Check System the identity of an individual who is prohibited from possessing a firearm under 18 U.S.C. 922(g)(4),

provided the covered entity:

(i) Is a State agency or other entity that is, or contains an entity that is:

(A) An entity designated by the State to report, or which collects information for purposes of reporting, on behalf of the State, to the National Instant Criminal Background Check System; or

(B) A court, board, commission, or other lawful authority that makes the commitment or adjudication that causes an individual to become subject to 18 U.S.C. 922(g)(4); and

(ii) Discloses the information only to:

(A) The National Instant Criminal Background Check System; or

(B) An entity designated by the State to report, or which collects information for purposes of reporting, on behalf of the State, to the National Instant Criminal Background Check System; and

(iii)

(A) Discloses only the limited demographic and certain other information needed for purposes of reporting to the National Instant Criminal Background Check System; and

(B) Does not disclose diagnostic or clinical information for such purposes.

(l) *Standard: Disclosures for workers' compensation.* A covered entity may disclose protected health information as authorized by and to the extent necessary to comply with laws relating to workers' compensation or other similar programs, established by law, that provide benefits for work-related injuries or illness without regard to fault.

[65 FR 82802, Dec. 26, 2000, as amended at 67 FR 53270, Aug. 14, 2002; 78 FR 5699, Jan. 25, 2013; 78 FR 34266, June 7, 2013; 81 FR 395, Jan. 6, 2016]

# § 164.520 Notice of privacy practices for protected health information.

## (a) Standard: Notice of privacy practices -

**(1) Right to notice.** Except as provided by paragraph (a)(2) or (3) of this section, an individual has a right to adequate notice of the uses and disclosures of protected health information that may be made by the covered entity, and of the individual's rights and the covered entity's legal duties with respect to protected health information.

**(2) Exception for group health plans.**

(i) An individual enrolled in a group health plan has a right to notice:

**(A)** From the group health plan, if, and to the extent that, such an individual does not receive health benefits under the group health plan through an insurance contract with a health insurance issuer or HMO; or

**(B)** From the health insurance issuer or HMO with respect to the group health plan through which such individuals receive their health benefits under the group health plan.

(ii) A group health plan that provides health benefits solely through an insurance contract with a health insurance issuer or HMO, and that creates or receives protected health information in addition to summary health information as defined in § 164.504(a) or information on whether the individual is participating in the group health plan, or is enrolled in or has disenrolled from a health insurance issuer or HMO offered by the plan, must:

**(A)** Maintain a notice under this section; and

**(B)** Provide such notice upon request to any person. The provisions of paragraph (c)(1) of this section do not apply to such group health plan.

(iii) A group health plan that provides health benefits solely through an insurance contract with a health insurance issuer or HMO, and does not create or receive protected health information other than summary health information as defined in § 164.504(a) or information on whether an individual is participating in the group health plan, or is enrolled in or has disenrolled from a health insurance issuer or HMO offered by the plan, is not required to maintain or provide a notice under this section.

**(3) Exception for inmates.** An inmate does not have a right to notice under this section, and the requirements of this section do not apply to a correctional institution that is a covered entity.

# § 164.524 Access of individuals to protected health information.

## (a) Standard: Access to protected health information -

**(1) Right of access.** Except as otherwise provided in paragraph (a)(2) or (a)(3) of this section, an individual has a right of access to inspect and obtain a copy of protected health information about the individual in a designated record set, for as long as the protected health information is maintained in the designated record set, except for:

(i) Psychotherapy notes; and

(ii) Information compiled in reasonable anticipation of, or for use in, a civil, criminal, or administrative action or proceeding.

**(2) Unreviewable grounds for denial.** A covered entity may deny an individual access without providing the individual an opportunity for review, in the following circumstances.

(i) The protected health information is excepted from the right of access by paragraph (a)(1) of this section.

(ii) A covered entity that is a correctional institution or a covered health care provider acting under the direction of the correctional institution may deny, in whole or in part, an inmate's request to obtain a copy of protected health information, if obtaining such copy would jeopardize the health, safety, security, custody, or rehabilitation of the individual or of other inmates, or the safety of any officer, employee, or other person at the correctional institution or responsible for the transporting of the inmate.

## Instructions

 Return in about 3 months (around 1/19/2021).

After Visit Summary (Automatic SnapShot taken 1/7/2021)

## Additional Documentation

| Vitals: | BP 132/63 (BP Location: Left arm, Patient Position: Sitting, Cuff Size: Standard) Pulse 77 |
|---|---|
| | Temp 97.1 °F (36.2 °C) ❗ (Abnormal) Ht 5' 6" (1.676 m) Wt 125 kg (274 lb 9.6 oz) |
| | BMI 44.32 kg/m² BSA 2.29 m² |
| Flowsheets: | Covid Symptom Screening |
| SmartForms: | ⮌ SLUHN PRE-CHARTING • |
| | ⮌ SLUHN PCMH/PCSP WRAP UP REQUIREMENTS ADVANCED • |
| | ⮌ SLUHN SCRIBE ATTESTATION |
| Encounter Info: | Billing Info, History, Allergies, Detailed Report |

## Orders Performed

Ambulatory referral to Neurology Pending Review

## Medication Changes

As of 1/7/2021  1:29 PM

None

## Visit Diagnoses

OSA (obstructive sleep apnea) G47.33
Intractable epilepsy without status epilepticus, unspecified epilepsy type (HCC) G40.919
Tremor, essential G25.0
PTSD (post-traumatic stress disorder) F43.10
Moderate episode of recurrent major depressive disorder (HCC) F33.1

||||||||||||||||||||||||||||||||||||||||||||||||||||||

U.S.M.S.
X-RAY

INMATE MAIL
This correspondence is from a
County Jail and the sender
is an inmate. The contents have not
been evaluated. Northampton County
Jail is not responsible for the
contents or debts incurred.

INMATE MAIL
This correspondence is from a
County Jail and the sender
is an inmate. The contents have not
been evaluated. Northampton County
Jail is not responsible for the
contents or debts incurred.

Legal Mail

U.S. District Court for Eastern Dist. of Pennsylvania
601 Market Street.
Philadelphia, PA 19106

August B. Kreis IV
County of Northampton
County Prison
666 Walnut Street
Easton, PA 18042-4497
Inmate # 5364

neopost
06/25/2021
US POSTAGE $002.40²
FIRST-CLASS MAIL
ZIP 18042
041L1220500G