# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

August B. Kreis IV

*Plaintiff(s)*

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

-v-

See attached

*Defendant(s)*

*(Write the full name of each defendant who is being sued. If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names. Do not include addresses here.)*

Case No. 21 CV 2360

*(to be filled in by the Clerk's Office)*

## COMPLAINT FOR VIOLATION OF CIVIL RIGHTS

(Prisoner Complaint)

### NOTICE

Federal Rules of Civil Procedure 5.2 addresses the privacy and security concerns resulting from public access to electronic court files. Under this rule, papers filed with the court should *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number.

Except as noted in this form, plaintiff need not send exhibits, affidavits, grievance or witness statements, or any other materials to the Clerk's Office with this complaint.

In order for your complaint to be filed, it must be accompanied by the filing fee or an application to proceed in forma pauperis.

James C. Kostura

John Kleinman

Mark T. Bartholomew

John Harmon

Charels Horvath

Jeremy Ackerman

Michael Gazzano

J. Santiago

Arias

Andrew Kuczma

Walker

Douglas

Primecare Medical Inc.

Jenn Keller

Polina

Shane P. Caffery

Nicki

Kerstyn

Page 1. con.

## I. The Parties to This Complaint

### A. The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint. Attach additional pages if needed.

Name: August B. Kreis IV

All other names by which you have been known: August B. Kreis, Byron

ID Number: 5264

Current Institution: Northampton County Prison

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

### B. The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. Make sure that the defendant(s) listed below are identical to those contained in the above caption. For an individual defendant, include the person's job or title *(if known)* and check whether you are bringing this complaint against them in their individual capacity or official capacity, or both. Attach additional pages if needed.

Defendant No. 1

Name: James C. Kostura

Job or Title *(if known)*: Department of Corrections Administrator

Shield Number:

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

☒ Individual capacity ☐ Official capacity

Defendant No. 2

Name: John Kleinman

Job or Title *(if known)*: Deputy Warden

Shield Number:

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

☒ Individual capacity ☐ Official capacity

Defendant No. 3

Name: Mark T. Bartholomew

Job or Title *(if known)*: Deputy Warden

Shield Number:

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

[X] Individual capacity [ ] Official capacity

Defendant No. 4

Name: John Harmon

Job or Title *(if known)*: Administration/Classification/Behavioral Board

Shield Number:

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

[X] Individual capacity [ ] Official capacity

## II. Basis for Jurisdiction

Under 42 U.S.C. § 1983, you may sue state or local officials for the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." Under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971)*, you may sue federal officials for the violation of certain constitutional rights.

A. Are you bringing suit against *(check all that apply)*:

[ ] Federal officials (a *Bivens* claim)

[X] State or local officials (a § 1983 claim)

B. Section 1983 allows claims alleging the "deprivation of any rights, privileges, or immunities secured by the Constitution and [federal laws]." 42 U.S.C. § 1983. If you are suing under section 1983, what federal constitutional or statutory right(s) do you claim is/are being violated by state or local officials?

1st, 5th, 8th, 14th Amendments

C. Plaintiffs suing under *Bivens* may only recover for the violation of certain constitutional rights. If you are suing under *Bivens*, what constitutional right(s) do you claim is/are being violated by federal officials?

I.

B.

The Defendant(s)

Defendant No. 5

Name: Charels Horvath

Job or Title: Northampton County DOC Professional Responsibility Investigat

Shield Number: 25417

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

☒ Individual Capacity ☐ Official Capacity

Defendant No. 6

Name: Jeremy Ackerman

Job or Title: Lieutenant

Shield Number:

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

☒ Individual Capacity ☐ Official Capacity

Defendant No. 7

Name: Michael Gazzano

Job or Title: Lieutenant

Shield Number:

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

☒ Individual Capacity ☐ Official Capacity

Defendant No. 8

Name: J. Santiago

Job or Title: Corrections Officer

Shield Number: 261

Employer: Northampton County Department of Corrections

Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

☒ Individual Capacity ☐ Official Capacity

Page 3 con.

I. B. The Defendant(s)

Defendant No. 9

Name: Arias
Job or Title: CERT Corrections Officer
Shield Number:
Employer: Northampton County Department of Corrections
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☐ Official Capacity

Defendant No. 10

Name: Andrew Kuczma
Job or Title: CERT Corrections Officer
Shield Number: 403
Employer: Northampton County Department of Corrections
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☐ Official Capacity

Defendant No. 11

Name: Walker
Job or Title: Corrections Officer
Shield Number: 273
Employer: Northampton County Department of Corrections
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☐ Official Capacity

Defendant No. 12

Name: Douglas
Job or Title: Corrections Officer
Shield Number: 476
Employer: Northampton County Department of Corrections
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☐ Official Capacity

I.

B.
The Defendant(s)

Defendant No. 13

Name: Primecare Medical Inc.
Job or Title: Contracted prisoner medical Care
Shield Number:
Employer:
Address: 3940 Locust Lane
Harrisburg (City) PA (State) 17109 (Zip Code)
☐ Individual Capacity ☒ Official Capacity

Defendant No. 14

Name: Jenn Keller
Job or Title: Medical Administrator
Shield Number:
Employer: Primecare Medical Inc
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☒ Official Capacity

Defendant No. 15

Name: Polina
Job or Title: Physicians Assistant
Shield Number:
Employer: Primecare Medical Inc.
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☒ Official Capacity

Defendant No. 16

Name: Shane P. Caffery
Job or Title: Director of Nursing
Shield Number:
Employer: Primecare Medical Inc.
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
☒ Individual Capacity ☒ Official Capacity

Page 3 con.

I.

B. The Defendants

Defendant No. 17

Name: Nicki
Job or Title: LPN
Shield Number:
Employer: Primecare Medical Inc.
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
[X] Individual Capacity [X] Official Capacity

Defendant No. 18

Name: Kerstyn
Job or Title: LPN
Shield Number:
Employer: Primecare Medical Inc.
Address: 666 Walnut Street
Easton (City) PA (State) 18042 (Zip Code)
[X] Individual Capacity [X] Official Capacity

D. Section 1983 allows defendants to be found liable only when they have acted "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia." 42 U.S.C. § 1983. If you are suing under section 1983, explain how each defendant acted under color of state or local law. If you are suing under *Bivens*, explain how each defendant acted under color of federal law. Attach additional pages if needed.

See attached

## III. Prisoner Status

Indicate whether you are a prisoner or other confined person as follows *(check all that apply)*:

- [x] Pretrial detainee
- [ ] Civilly committed detainee
- [ ] Immigration detainee
- [ ] Convicted and sentenced state prisoner
- [ ] Convicted and sentenced federal prisoner
- [ ] Other *(explain)* ______

## IV. Statement of Claim

State as briefly as possible the facts of your case. Describe how each defendant was personally involved in the alleged wrongful action, along with the dates and locations of all relevant events. You may wish to include further details such as the names of other persons involved in the events giving rise to your claims. Do not cite any cases or statutes. If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

A. If the events giving rise to your claim arose outside an institution, describe where and when they arose.

B. If the events giving rise to your claim arose in an institution, describe where and when they arose.

See attached

II. Basis for Jurisdiction

D.

1) Department of Corrections Administrator James C. Kostura acted under Pennsylvania state Legislature/Law.

2) Northampton County Prison Deputy Warden John Kleinman acted under Pennsylvania State Legislature/Law.

3) Northampton County Prison Deputy Warden Mark T. Bartholomew acted under Pennsylvania State Legislature/Law.

4) Northampton County Prison Administration/Classification/ Behavioal Board Examiner John Harman acted under Pennsylvania State Legislature/Law.

5) Northampton County Department of Corrections Professional Responsibility Investigator Charels Horvath acted under Pennsylvania State Legislateure/Law.

6) Northampton County Prison Lieutenant Jermy Ackerman acted under Pennsylvania State Legislature/Law.

7) Northampton County Prison Lieutenant Michael Gazzano acted under Pennsylvania State Legislature/Law.

8) J. Santiago Northampton County Prison Corrections officer acted under color of Pennsylvania State Legislature/Law.

9) Northampton County Department of Corrections Corrections Officer Arias acted under Pennsylvania State Legislature/Law

II. Basis for Jurisdiction

D.

10) Northampton County Department of Corrections Corrections Officer Andrew Kuczma acted under Pennsylvania State Legislature/Law.

11) Northampton County Department of Corrections Corrections Officer Walker acted under Pennsylvania State Legislature/Law.

12) Northampton County Department of Corrections Corrections Officer Douglas acted under Pennsylvania State Legislature/Law.

13) Primecare Medical Inc. acted under Pennsylvania State Legislature/Law as a contracted medical provider acting in the States stead.

14) Primecare Medical Inc. medical Administrator Jenn Keller acted under Pennsylvania State Legislature/Law as an employee of a contracted medical provider acting in the States Stead.

15) Primecare Medical Inc. Physicians Assistant Polina acted under Pennsylvania State Legislature/Law as an employee of a contracted medical provider acting in the States Stead.

16) Primecare Medical Inc. Director of Nursing Shane P. Caffery acted under Pennsylvania State Legislature/Law as an employee of a contracted medical provider acting in the States stead.

II. Basis for Jurisdiction

D.

17) Primecare Medical Inc. LPN Nicki acted under Pennsylvania State Legislature/state law as an employee of a contracted medical provider acting in the States stead.

18) Primecare Medical Inc LPN Kerstyn acted under Pennsylvania State Legislature/Law as an employee of a contracted medical provider acting in the States stead.

IV. Statement of Claim

B. 1) In the Medical Unit apon the calling of a "Code Blue" medical emergency. On 12/8/2020 at approximately 9:00 am Lieutenant Jeremy Ackerman "Drive Tased" me in a siezure multiple times in my chest over my VNS implant. The CERT Corrections Officer Andrew Kuczma who called the "Code Blue" medical emergency was directly involved because, while in a siezure I put my right hand on Officer Andrew Kuczma and Lieutenant Jeremy Ackerman with my left hand locked in a cuff belted to my body sitting in a chair. I appealed the misconduct issued by Lieutenant Jeremy Ackerman and John Klienman told me I was in control of myself and I did it on purpose.

B. 2) On H-Tier in housing H-06 when trying to get medical attention. In the end of Feburary 2021 at approximately 4:00 pm I tried to get medical attention by asking the tier Corrections Officers attention and Officers J. Santiago and Arias if they could please contact medical. I told them that something didn't feel right and that I was going to have a siezure, that I was having an arura to a siezure. Both officers stated "I was talking to them and I was fine, there was no need for medical to come." Five minutes after both officers walked away I had a siezure and a "Code Blue" medical emergency was called. Northampton County Prison CERT responded and took me to the medical Unit via the "Striker Chair". Primecare Medical Inc. LPN Joni was the responding medical provider in the Medical Unit.

IV. Statement of Claim

B.3) H-Tier in H14 housing on 3/8/2021 at approximately 10:00 am. I was sent on a medical run to St. Lukes Anderson Campus prior to my surgery and right before I left for the medical run CERT Corrections Officer Andrew Kuczma came to my housing cell and told me and my cellmate to pack up and that we are getting moved into the cell next door H15. I told Officer Andrew Kuczma not to do that and it will result in a physical altercation because, I had heard the inmate in H15 talking on the gate about assualting me. Despite my giving notice of physical altercation in advance when I came back from the medical run my belongings were in H15 and I was placed in the cell. Which resulted in a fight and me getting punched and Kicked within 15 minutes. I yelled for help and CERT responded to a "Code Red"

B.4) H-Tier in H-05 housing on 3/10/2021 at approximately 3:00pm apon returning from surgery on my VNS implant for severe epilepsy control. Medical had me placed back into a dirty 150 year old housing cell, infested with roaches and me having open neuro surgery wounds. I was told by one of the Primecare LPNs that medical segragations 5 cells were full.

B.5) H-Tier in H-05 housing on the third week of March at approximately 12:00pm I was called down to medical and was escorted by Corrections Officer Lumbardo badge #330 to Medical Administrator Jenn Keller's Office. After being told by MDs multiple times they finally fixed my CPAP machine after another inmate broke it. I did not have it for use for about two and a half months. Jenn Keller stated that "she took it to Youngs Medical Supply and they just had to replace the hose connection and the hose. They told me the LCD screen did not need to be fixed and that all of the settings are in it. You can fix the screen when you get out. Corporate wouldn't approve it so it came out of our pocket take care of it." Corrections Officer Lumbardo wittness the entire incodent.

IV. Statement of Claim

B. 6) H-Tier in H-Ø5 housing during a cell search 4/12/2021 by CERT Corrections Officer Michael Gazzano at 7:10 am he assaulted me. Michael Gazzano stood, slammed me backwards in the chest stating "Mother Fucker" slamming my head off of the bunk then he immediately arm barred me 90° to my left bringing me to the floor and slamming my head into the desk. Once I was on the floor Officer Michael Gazzano knealed on my tail bone causing severe pain from a prior injurey. Shadowing Officer Bochini was in the cell the entire time and and witnessed the actions of Michael Gazzano. Once Michael Gazzano called a "Code Red" and the CERT responded and Lt. Chad Rinker badge # 36 was the responding Lieutenant and everything from then forward is recorded on Lieutenants bodycam I was already on the floor and nothing Michael Gazzano did is recorded on bodycam. Michael Gazzano and Bochini entered the cell off of video recording. CERT Corrections Officer Michael Gazzano was a cammanding Officer on H-Tier "Special Needs" and being a CERT member as well he needs to be aware of all medically cleared security risks so they are not just contraband. He knows of my CPAP being medically cleared and the magnet bracelet for VNS implant being cleared for my severe epilepsy control. Michael Gazzano got promoted to Lt. shortly after.

Page 4. con.

B.7) After the incodent on 4/12/2021 at 7:10 am in cell H-05 Michael Gazzano wrote a False Formal Misconduct that directly caused me to be placed on "High Risk" from the date 4/12/2021 to 5/12/2021, inwhich I only recieved 3 showers on the dates of 4/28/2021, 5/5/2021 and 5/8/2021. Corrections Officer Quinones badge 482 is witness to this and he is the Officer that give me the first shower as well because, he went and "checked the log" came back to M-2 and said "you arent even in it" I had been moved to M-2 on 4/22/2021.

B.8) After filing two administrative grievances while in H-05 on H-Tier "Special Needs" after the incodent with Michael Gazzano grievance numbers 23-2021 and 24-2021 in the 3rd week of April 2021 both of which were denied as ungrievable by Mark T. Bartholomew. The grievance for the actions of Michael Gazzano on 4/12/2021 was used by DOC Investigator Charels Horvath to ultimately charge me with 4 criminal charges after Horvath went to DOC Administrator James C. Kostura and used the letter of grievance to the situation on 4/12/2021 with Michael Gazzano as evidance to charge me on 4/22/2021 the day I was moved to Medical Segragation. After being given the order to criminally charge me by Administration the charges were originally filled on 4/20/2021 and when I was taken to Northampton County Central Booking and had a preliminary arriagnment Charels Horvath had my grievance in his hand and stated "you are being charged with 4 criminal charges and your grievance will go no further with me."

IV. Statement of Claim

B.9) Medical Hallway when being escorted back to my cell M-2 in Medical Segregation on 5/17/2021 at 9:00am the Medical Administrator Jenn Keller threw the grievance I had just prieviously given her at me stating "I am not dealing with HIPPA, we wasted enough time on you." Both escorting Officers Lumbardo badge # 330 and CERT Arias fully witnessed.

B.10) Being brought through intake into Northampton County Prison by Corrections Officer J. Wagner, Primecare Medical Inc. RN CATHRINE was the medical provider for my intake and my questioning. I was asked about any health conditions and what the magnet bracelet was for that was in my possession and the statement was made by RN Chathrine at intake on 11/9/2020 6:00 am "With his epilepsy and that bracelet for his implant he needs to stay on "Medical Observation" on the "Flats" H-Tier "Special Needs"

B.11) In medical M-2 Medical Segragation after returning from the formal arraignment for the charges by the Palmer Township Police on 6/24/2021 at 9:00 am I was told to pack my stuff and that I was moving. I was moved to E. Tier "The hole" after Primecare Medical Inc defendants Polina and Jenn Keller removed me from "medical observation", "Clearing me" to be placed unmonitored in the hole. Despite knowing the severity of my medical conditions because, of all the siezures I already had plus the surgery I already went through. I was told by Jenn Keller that everything gets documented and entered through the computer to Corporate, so the MD's prescribed orders of treatment should be documented as to be monitored. Two days prior After I had filed several more grievances while in Med. Seg, Polina had looked at me while on the Tier/Unit and told me to "Mind your lane Kreis". The final grievance I wrote medical on Med. Seg. was on 6/10/2021 about the proper times of administering the medication for continued treatment. 12 hour incriments.

IV. Statement of Claim

B.12) In Medical Segregation on 6/24/2021 at 9:00 am upon Polina and Jenn Keller "clearing me" off of "Medical Observation" John Harmon knowing the severity of my medical conditions because, of all of the "Code Blue" medical emergency incodents CERT corrections officers have responded to, me going in and out of the facility on "medical runs", and me using a medical machine. John Harmon chose to house me completely unmonitored and unable to get adequate medical care for the amount of medical care I need.

B.13) In E-Tier Cell 13 ever since being moved up here after being taken off of "Medical Observation" I have not had access to more consistant medical provisions since 6/24/2021 9:00am. The Primecare Medical Entity in this jail refuses to bring me provisions like distilled water for my CPAP which leaves me no choice to either run dirty tap water through it and destroy the humidifier and increase the risk of lung infection or not to use the humidifier at all and my throat burn. I ~~was~~ told ~~to~~ Primecare medical in Northampton County Prison multiple times and by MD that "I MUST WEAR CPAP" which is why eventualy it was fixed But, Corporate wouldn't even approve.

B.14) On 9/21/21 at approximately 11:00am I spoke with John Klienman on E-Tier about the lack of medical care I am recieving and about a Fake Formal misconduct that a Corrections Officer just wrote on me which was keeping me in solitary confinemant and interfering with my access to medical care. I put in the appeal because, he said he will look into it and take me out of solitary. I put it in and it was denied.

IV. Statement of Claim

7/24/2021

B.15) On E-Tier in Cell E-13 at 10:00am upon morning med. pass LPN Barbara informed me that DON Shane never reordered my "Vimpat" Life sustaining medication so she didn't have it for me. This was witnessed by Corrections Officer Byrd badge # 414. This resulted in me missing 7 doses and me having two siezures on the weekend of 7/24/2021 and 7/25/2021. Niether one even noticed by the Corrections Officers. I woke up with bruses, lacerations and severe headache.

B.16) The entire time being in Northampton County Prison Primecare Medical Inc. employees have given me generic "Trileptal" which in my MD proscribed "Life sustaing medication" anti-convulsants it clearly states it is BRAND NAME ONLY in my medical records. The mixture of medications I am being given cause headaches, dizziness and light headedness. I have alerted medical staff to this many times. The side affect feeling making me feel as though I am going to go into a siezure.

B.17) ON E-Tier while in Cell E-13 first week of August I put in a Primecare grievance because, on multiple times on med. pass I did not recieve my "Life Sustaining medicat-ion. Telling them I can't hear over my CPAP, and I wasn't awake

B.18) ON E-Tier while in Cell E-13 once I got my hands on a grievance for administration from Lt. Williams First week of September I put it in on Corrections Officer Walker because he was the Officer escorting the medical staff all times I missed my "Life sustaining medication" and I explained in the grievance that the officer was only tipping the wicket, wispering or stating the question "Do you want your meds?" then after 30 seconds if I didn't answer just slamming the wicket closed and writing that I denied. John Harmon takes care of the grievances on E-Tier and he denied grievance stating "it is my responsibility to be up for the meds" Even after explaining with my CPAP running and in REM 2 sleep I don't hear.

B.19) On 6/8/2021 When I was in Med. Seg. cell M2 Primecare Dr. and RN Cathrine came and asked me when I started using my CPAP breathing assistanting medical Machine. When all that information is in my medical records that I signed off for HIPPA Law to access.

B.20) On E-Tier in cell 13 officer Hampton escorted me to the medical Unit and I was to speak to PA Polina and She stated "All of your follow up appiontments are scheduled and medication is refilled.". I also asked to speak to Administrator Jean Keller and she came in the medical Unit and I asked her "Why am I being housed unmonitored on E-Tier?" Jean Keller's response was "Because the administration has a job to do to and they are not going to waste a 4man cell on 1 person." PA Polina and DON Shane Cafferey both told me that "medical has nothing to do with where they chose to house me at". 9/16/2021 11:00am.

B.21) 10/6/2021 E-Tier cell 13 8:00pm. Primecare Medical Inc. has a practice of not approving things as a way to save money and pocket money from contract over giving adequate medical care, (see claim 5). Primecare Medical Inc. has a practice of using generic medications to save money over adequate medical care, (see claim 16). Primecare Medical Inc. doesn't uphold to its own policy of looking into your prior medical records as to contineadequate medical care, (see claim 19). Primecare Medical Inc doesn't monitor their employees in anyway even when being put on notice of their employees actions by a MD or since 6/24/2021 being on E-Tier I have written to their Corporate Office in Harrisburg, PA twice and I wrote multiple more times since 3/1/2021. They don't punish staff for abuse of power.

B.22) E-Tier Cell 13 8/24/2021 Corrections Officer Douglas Wrote a Fake misconduct after lying to the Lts office and just had Officer Plum sign it. Which resulted in me getting another 45 days in the hole with little to no medical care and no monitoring of my severe epilepsy because, John harman gave me 45 days for a tray falling on the floor. Douglas knows of my medical problems and needs, shortly before the writing of that misconduct Douglas was working E-Tier and on med. pass stated "I don't want to hear any shit just take the damn meds."

B.23) On E-Tier in cell E-13 on 9/22/2021 at 9:00pm I came to awareness on the floor "Concious Dominion" and I made both Corrections Officers working the tier, Officers Cleffi badge #406 and Brewer badge #494 aware that I just came to on the floor and that I had a severe headache. While at the gate Officer Brewer informed me that I had a "Huge Knot" on my head and I was bleeding from my right hand. Officer Brewer immediately called medical and he was told "We will be right up." Twenty minutes later Officer Cleffi called medical and asked where they were. Medical stated to Officer Cleffi that "They will be up when they are done." Twenty minutes later Officer Brewer called medical again because, no one had came. Medical stated to Officer Brewer "We will leave note for the next shift to check" No one ever even came to check my vitals or anything.

B.24) On E-Tier 9/24/2021 at 12:00pm when Jenn Keller came on the tier I spoke to her about no one ever coming to see me after I had a siezure and about the multiple Primecare medical requests that she said to put in for the documentation of a request for the x ray of my tail bone because, no effective medical care to date. Keller said "I will look into the x ray and I will talk to staff about no one coming to see you". NO Primecare employee in a supervisor position actually supervises their subordinate staff.

B.25) On E-Tier in Cell-13 on 9/27/2021 at 1:40am I had a conversation on the gate with Corrections Officer Joshua A. Plum badge #274 and Officer Plum stated "I Know it was an accident but, CO Douglas told me to do it", "He told me to cover my ass and write you up.", "Yea, I am sorry man.... I wasn't even going to write you up the tray just fell on the floor, you shouldn't even be up here." (see claim 22)

B.26) On E-Tier in cell-13 on 10/3/2021 10:20am DON Shane brought the morning med pass. There is no consistency in administration of medication. The prescribed ongoing treatment for epilepsy control is to be taken in 12 hour increments. The Northampton County Prison inmate handbook states 6:00am and 8:00pm as the medication times. Even in the Medical Segragation Unit I wasn't getting my medications at proscribed times and it was causing headaches and the fear they would progress into siezures. This was the basis of my grievance in medical. (see claim 11)

IV. Statement of Claim

B.27) On E-Tier in Cell 13 E-Tier on 10/8/2021 at 5:00 pm Corrections Officer Cleffi badge # 406 and Officer J. Davis informed me that while their class was going through training they used the Lieutenant's Bodycam footage of me getting tased in a siezure on 12/5/2020 as a training video.

B.28) On E-Tier in Cell 13 on 10/9/2021 at 2:30pm I wrote a letter to Deputy Warden Mark T. Bartholomew about my lack of medical care in the current housing unit (See attached) even though medical care is left to Primecare Medical Inc.. I still am not recieving proper care. I have grieved to all levels of administration this problem and it is ignored.

B.29) on E-Teir in cell 13 on 10/9/2021 at 4:30pm I wrote another letter to Primecare Medical Inc. Corporate Office, now my 3rd time writing their Corporate Office since being put on E Tier on 6/24/2021 about my lack of medical care and the letters have all went un answered with no change to the actions of the medical staff. Since 3/1/2021 I have written to that office 7 times to put them on notice. Also they have recieved MD's orders that are to be documented with Corporate (see claim 21) (see attached)

B.30) On E-Tier in cell 13 on 10/9/2021 at 4:30 pm my evening medications, medication was distributed by Primecare LPN Nicki no where near the 12 hour prescribed incriment of continued treatment as pursuant to MD's order. Also no where near Northampton County Prison inmate handbook time 8:00pm evening medication. I asked "Nicki" for a Primecare Medical grievance for the incident on 9/22/2021 that Jenn Keller said she will talk to them about. LPN Nicki said no and asked witness Corrections Officer Brewer badge 494 "can he prove it?" she laughed and walked away.

IV. Statement of Claim

B.31) On E-Tier in cell 13 between 7/13/2021 - 7/22/2021 Corrections Officer Byrd badge # 414 stated "we are on lock down, no DS showers or rec.". I spent 9 days on "lock down" with no showers or recreation. 24/7 in the cell and Officer Byrd stated "per administration."

B.32) On E-Tier cell 13 morning of 10/11/2021 10:00 am. I missed my "life sustaining Medications" for my epilepsy because, Walker badge # 273 didn't "go out of his way" to get me up. walker stated "That isn't my job." I immediately wrote to DOC Administrator James C. Kostura. to inform him of the events taking place. (see attached)

B.33) on E-Tier in cell 13 morning of 10/11/2021 10:45 am Corrections Officer Heatherman called medical because, I asked if my medications I missed can be brought at afternoon medications and LPN Kerstyn stated "He doesn't get afternoon medications." Officer Heatherman informed me of LPN Kerstyn's comment. I never recieved my morning dose of "Life sustaining medications"

B.34) on E-Tier in Cell-13 10/14/2021 12:30 pm Corrections Officer Marsh-all witness to Director of Nursing Shane P. Caffery coming to E-Tier to give me distilled water. Shane state "How much water can you possibily need?" after filling 5 styrafoam cups and I stated "I sleep 16 hours a day, 2 8hour shifts and per the MD I MUST wear the CPAP any time I sleep Sr." I followed by asking shane if he got the grievance I wrote on the date of 10/11/2021 at 11:00am about the incident of 9/22/2021 when no one came to see me after a siezure and that morning of 10/11/21 when LPN Kerstyn denyed me of my "Life sustaining medication" by stating "He doesn't get afternoon meds" to Officer Heatherman. Shane said he will sign it and get it back to me. I never saw it again.

Page 4 con.

C. What date and approximate time did the events giving rise to your claim(s) occur?

See attached

D. What are the facts underlying your claim(s)? *(For example: What happened to you? Who did what? Was anyone else involved? Who else saw what happened?)*

See attached

## V. Injuries

If you sustained injuries related to the events alleged above, describe your injuries and state what medical treatment, if any, you required and did or did not receive.

mental Anguish, jaw pain, head trama, lacerations, bruising, severe chest pain, severe chest pain and bleeding, throat burning, Left sided sciatic pain at my tail bone, severe head aches. physical therapy I never recieved

## VI. Relief

State briefly what you want the court to do for you. Make no legal arguments. Do not cite any cases or statutes. If requesting money damages, include the amounts of any actual damages and/or punitive damages claimed for the acts alleged. Explain the basis for these claims.

$1,200.00 actual damages for the breaking of my personal property medical machine CPAP.

$500,000,000.00 punitive damages for inadequate medical care, Failure to rectify Constitutional violations, Violation of Due Process of Law, retaliation, Deliberate Indifference

## VII. Exhaustion of Administrative Remedies Administrative Procedures

The Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a), requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."

Administrative remedies are also known as grievance procedures. Your case may be dismissed if you have not exhausted your administrative remedies.

A. Did your claim(s) arise while you were confined in a jail, prison, or other correctional facility?

- [x] Yes
- [ ] No

If yes, name the jail, prison, or other correctional facility where you were confined at the time of the events giving rise to your claim(s).

Northampton County Prison

B. Does the jail, prison, or other correctional facility where your claim(s) arose have a grievance procedure?

- [x] Yes
- [ ] No
- [ ] Do not know

C. Does the grievance procedure at the jail, prison, or other correctional facility where your claim(s) arose cover some or all of your claims?

- [x] Yes
- [ ] No
- [ ] Do not know

If yes, which claim(s)?

All Claims

D. Did you file a grievance in the jail, prison, or other correctional facility where your claim(s) arose concerning the facts relating to this complaint?

- [x] Yes
- [ ] No

If no, did you file a grievance about the events described in this complaint at any other jail, prison, or other correctional facility?

- [ ] Yes
- [ ] No

E. If you did file a grievance:

1. Where did you file the grievance?

Northampton County Prison

2. What did you claim in your grievance?

the actions of Corrections Officers use of Maliciousness

3. What was the result, if any?

grievance was denied as ungrievable

4. What steps, if any, did you take to appeal that decision? Is the grievance process completed? If not, explain why not. *(Describe all efforts to appeal to the highest level of the grievance process.)*

I appealed to the highest ability available to me and wrote a hand writen letter to the Deputy Warden Mark T. Bartholomew when grievance was denied.

F. If you did not file a grievance:

1. If there are any reasons why you did not file a grievance, state them here:

2. If you did not file a grievance but you did inform officials of your claim, state who you informed, when and how, and their response, if any:

G. Please set forth any additional information that is relevant to the exhaustion of your administrative remedies.

The grievance process set forth for inmates use in this county detainment facility was barred from use by every grievance denied.

*(Note: You may attach as exhibits to this complaint any documents related to the exhaustion of your administrative remedies.)*

## VIII. Previous Lawsuits

The "three strikes rule" bars a prisoner from bringing a civil action or an appeal in federal court without paying the filing fee if that prisoner has "on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury." 28 U.S.C. § 1915(g).

To the best of your knowledge, have you had a case dismissed based on this "three strikes rule"?

☐ Yes

☒ No

If yes, state which court dismissed your case, when this occurred, and attach a copy of the order if possible.

A. Have you filed other lawsuits in state or federal court dealing with the same facts involved in this action?

☐ Yes

☒ No

B. If your answer to A is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1. Parties to the previous lawsuit

   Plaintiff(s) ____________________

   Defendant(s) ____________________

2. Court *(if federal court, name the district; if state court, name the county and State)*

   ____________________

3. Docket or index number

   ____________________

4. Name of Judge assigned to your case

   ____________________

5. Approximate date of filing lawsuit

   ____________________

6. Is the case still pending?

   ☐ Yes

   ☐ No

   If no, give the approximate date of disposition. ____________________

7. What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

   ____________________

C. Have you filed other lawsuits in state or federal court otherwise relating to the conditions of your imprisonment?

☐ Yes

☒ No

D. If your answer to C is yes, describe each lawsuit by answering questions 1 through 7 below. *(If there is more than one lawsuit, describe the additional lawsuits on another page, using the same format.)*

1. Parties to the previous lawsuit

   Plaintiff(s) __________

   Defendant(s) __________

2. Court *(if federal court, name the district; if state court, name the county and State)*

3. Docket or index number

4. Name of Judge assigned to your case

5. Approximate date of filing lawsuit

6. Is the case still pending?

   ☐ Yes

   ☐ No

   If no, give the approximate date of disposition __________

7. What was the result of the case? *(For example: Was the case dismissed? Was judgment entered in your favor? Was the case appealed?)*

## IX. Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

### A. For Parties Without an Attorney

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 10/17/2021

Signature of Plaintiff: August B. Kreis IV

Printed Name of Plaintiff: August B. Kreis IV

Prison Identification #: 5264

Prison Address: 666 Walnut Street

Easton (City) PA (State) 18042 (Zip Code)

### B. For Attorneys

Date of signing: ____________

Signature of Attorney: ____________

Printed Name of Attorney: ____________

Bar Number: ____________

Name of Law Firm: ____________

Address: ____________

____________ City ____________ State ____________ Zip Code

Telephone Number: ____________

E-mail Address: ____________

**(i)** ***Permitted disclosures.*** A covered entity may disclose to a correctional institution or a law enforcement official having lawful custody of an inmate or other individual protected health information about such inmate or individual, if the correctional institution or such law enforcement official represents that such protected health information is necessary for:

**(A)** The provision of health care to such individuals;

**(B)** The health and safety of such individual or other inmates;

**(C)** The health and safety of the officers or employees of or others at the correctional institution;

**(D)** The health and safety of such individuals and officers or other persons responsible for the transporting of inmates or their transfer from one institution, facility, or setting to another;

**(E)** Law enforcement on the premises of the correctional institution; or

**(F)** The administration and maintenance of the safety, security, and good order of the correctional institution.

**(ii)** ***Permitted uses.*** A covered entity that is a correctional institution may use protected health information of individuals who are inmates for any purpose for which such protected health information may be disclosed.

**(iii)** ***No application after release.*** For the purposes of this provision, an individual is no longer an inmate when released on parole, probation, supervised release, or otherwise is no longer in lawful custody.

**(6)** ***Covered entities that are government programs providing public benefits.***

**(i)** A health plan that is a government program providing public benefits may disclose protected health information relating to eligibility for or enrollment in the health plan to another agency administering a government program providing public benefits if the sharing of eligibility or enrollment information among such government agencies or the maintenance of such information in a single or combined data system accessible to all such government agencies is required or expressly authorized by statute or regulation.

**(ii)** A covered entity that is a government agency administering a government program providing public benefits may disclose protected health information relating to the program to another covered entity that is a government agency administering a government program providing public benefits if the programs serve the same or similar populations and the disclosure of protected health information is necessary to coordinate the covered functions of such programs or to improve administration and management relating to the covered functions of such programs.

**(7)** ***National Instant Criminal Background Check System.*** A covered entity may use or disclose protected health information for purposes of reporting to the National Instant Criminal Background Check System the identity of an individual who is prohibited from possessing a firearm under 18 U.S.C. 922(g)(4), provided the covered entity:



**(i)** Is a State agency or other entity that is, or contains an entity that is:

**(A)** An entity designated by the State to report, or which collects information for purposes of reporting, on behalf of the State, to the National Instant Criminal Background Check System; or

**(B)** A court, board, commission, or other lawful authority that makes the commitment or adjudication that causes an individual to become subject to 18 U.S.C. 922(g)(4); and

**(ii)** Discloses the information only to:

**(A)** The National Instant Criminal Background Check System; or

**(B)** An entity designated by the State to report, or which collects information for purposes of reporting, on behalf of the State, to the National Instant Criminal Background Check System; and

**(iii)**

**(A)** Discloses only the limited demographic and certain other information needed for purposes of reporting to the National Instant Criminal Background Check System; and

**(B)** Does not disclose diagnostic or clinical information for such purposes.

**(l)** ***Standard: Disclosures for workers' compensation.*** A covered entity may disclose protected health information as authorized by and to the extent necessary to comply with laws relating to workers' compensation or other similar programs, established by law, that provide benefits for work-related injuries or illness without regard to fault.

[65 FR 82802, Dec. 28, 2000, as amended at 67 FR 53270, Aug. 14, 2002; 78 FR 5699, Jan. 25, 2013; 78 FR 34266, June 7, 2013; 81 FR 395, Jan. 6, 2016]



10/10/2021 Civil Action No. 21-CV-2360 August B. Kiero III

## § 164.520 Notice of privacy practices for protected health information.

**(a)** ***Standard: Notice of privacy practices*** -

**(1)** ***Right to notice.*** Except as provided by paragraph (a)(2) or (3) of this section, an individual has a right to adequate notice of the uses and disclosures of protected health information that may be made by the covered entity, and of the individual's rights and the covered entity's legal duties with respect to protected health information.

**(2)** ***Exception for group health plans.***

**(i)** An individual enrolled in a group health plan has a right to notice:

**(A)** From the group health plan, if, and to the extent that, such an individual does not receive health benefits under the group health plan through an insurance contract with a health insurance issuer or HMO; or

**(B)** From the health insurance issuer or HMO with respect to the group health plan through which such individuals receive their health benefits under the group health plan.

**(ii)** A group health plan that provides health benefits solely through an insurance contract with a health insurance issuer or HMO, and that creates or receives protected health information in addition to summary health information as defined in § 164.504(a) or information on whether the individual is participating in the group health plan, or is enrolled in or has disenrolled from a health insurance issuer or HMO offered by the plan, must:

**(A)** Maintain a notice under this section; and

**(B)** Provide such notice upon request to any person. The provisions of paragraph (c)(1) of this section do not apply to such group health plan.

**(iii)** A group health plan that provides health benefits solely through an insurance contract with a health insurance issuer or HMO, and does not create or receive protected health information other than summary health information as defined in § 164.504(a) or information on whether an individual is participating in the group health plan, or is enrolled in or has disenrolled from a health insurance issuer or HMO offered by the plan, is not required to maintain or provide a notice under this section.

**(3)** ***Exception for inmates.*** An inmate does not have a right to notice under this section, and the requirements of this section do not apply to a correctional institution that is a covered entity.



## § 164.524 Access of individuals to protected health information.

**(a)** ***Standard: Access to protected health information*** -

**(1)** ***Right of access.*** Except as otherwise provided in paragraph (a)(2) or (a)(3) of this section, an individual has a right of access to inspect and obtain a copy of protected health information about the individual in a designated record set, for as long as the protected health information is maintained in the designated record set, except for:

**(i)** Psychotherapy notes; and

**(ii)** Information compiled in reasonable anticipation of, or for use in, a civil, criminal, or administrative action or proceeding.

**(2)** ***Unreviewable grounds for denial.*** A covered entity may deny an individual access without providing the individual an opportunity for review, in the following circumstances.

**(i)** The protected health information is excepted from the right of access by paragraph (a)(1) of this section.

**(ii)** A covered entity that is a correctional institution or a covered health care provider acting under the direction of the correctional institution may deny, in whole or in part, an inmate's request to obtain a copy of protected health information, if obtaining such copy would jeopardize the health, safety, security, custody, or rehabilitation of the individual or of other inmates, or the safety of any officer, employee, or other person at the correctional institution or responsible for the transporting of the inmate.

Microsoft Bing cognitive awareness

Sign in 60

ALL IMAGES VIDEOS MAPS NEWS SHOPPING

Get the Wallpaper App >

98,700 Results Any time

What is **Cognitive Awareness** 1. It refers to the ability of the Web agents to diagnose their processing limitations and to establish interactions with the external environment (in the form of other agents including humans and software agents). Learn more in: Enabling Distributed **Cognitive** Collaborations on the Semantic Web

What is Cognitive Awareness | IGI Global

www.igi-global.com/dictionary/enabling-distributed-cognitive-collaborations-se...

Was this helpful?

PEOPLE ALSO ASK

What is the meaning of cognitive awareness?

What are the different types of cognitive processes?

What is an example of a cognitive ability?

What is cognitive ability?

Feedback

## Cognitive awareness - PCP

www.pcp-net.org/encyclopaedia/aware.html

The lowest level of cognitive awareness is preverbal construing - which is developed before the onset of language and is definitely "unconscious". Then there is submergence - in which one pole of a personal construct is not available, and suspension - in which one or more of the elements making up a construct have been "dropped out" when a new construct is formed; he relates this to forgetting and repression.

Personal Construct Theory · Fundamental Postulate

## What is Cognitive Awareness | IGI Global

https://www.igi-global.com/dictionary/enabling...

Definition of **Cognitive Awareness:** It refers to the ability of the Web agents to diagnose their processing

10/16/2021 Civil Action No. 21-CV-2360 August B. Kreis III

Microsoft Bing | vagus nerve stimulator | Sign in 55

ALL IMAGES VIDEOS MAPS NEWS SHOPPING

Get the Wallpaper App >

for epilepsy | for tinnitus | for depression | for migraine


## HF10™ Superior Pain Relief | Experiencing Chronic Pain? | hf10.com

https://www.hf10.com/learn-more ▾

Ad Liberate Yourself From Back Pain And Leg Pain With Hf10™ Spinal Cord **Stimulation**. HF10™ Is A Simple Procedure, Proven To Deliver Long-Term Pain Relief. FDA Approved.

Clinically Proven Relief · Find a Physician · Try it First · Regain Your Independence

**Types:** Nerve Pain Relief, Back Pain Relief, Chronic Pain Relief, Arm and Leg Pain Relief

### Learn - HF10
Chronic pain is one of the most common reasons Americans seek ...

### HF10 Stories Archives - HF10
After years of debilitating pain, Gregor found relief with HF10.

### What To Expect - HF10
Get back to the things you love. Try HF10 in a temporary trial ...

### Find a Physician
Proven Safe and Effective. Covered By Most Insurance.

### Try Before You Decide
Covered By Most Insurance No Major Surgery. Just Relief.

### How HF10 Works - HF10
HF10 the only Spinal Cord **Stimulation** (SCS) option to be ...

See results only from hf10.com


ANSWER FROM 5 SOURCES

Vagus nerve stimulation or vagal nerve stimulation (VNS) is a medical treatment that involves delivering electrical impulses to the vagus nerve. It is used as an adjunctive treatment for certain types of intractable epilepsy and treatment-resistant depression.

**Vagus nerve stimulator *for migraine***

The stimulus from the vagus nerve enters the brain stem and translates into pain relief for migraines. The inspiration for using vagus nerve stimulation for migraines comes from the success of implanted devices to control epilepsy or

See all images

## Vagus nerve stimulation

CPT code | Procedure | Side effects

Vagus nerve stimulation is a medical treatment that involves delivering electrical impulses to the vagus nerve. It is used as an add-on treatment for certain types of intractable epilepsy and treatment-resistant depression. Frequent side effects include coughing and shortness of breath. Serious side effects may include trouble talking and cardiac arrest.

Wikipedia

**May treat:** Epilepsy

### People also search for
See all (15+)



10/10/2021 Civil Action No. 21-CV-2360 August B. Kreis III

Mr. Kostura, 10/4/2021

Sir you are a Navy Seal, the hell you went through to earn that trident, the lazy individuals that work in this detainment facility would not last a day. I don't know how many men you had to honor their passing but, when someone looses a life it is not fun. When someone hangs it up within these walls a "Code blue" medical emergency is called and CERT response with ALL available officers. If oxygen is cut off to the brain for too long.... you're dead. I suffer from an illness that will result in just the same. There is an extension cord going into my cell for a CPAP because, my oxygen saturation going to my brain drops below 90% for 20% of sleep. It just might be my last breathe. Then I also have a very objectively serious severe epilepsy condition in where to this date I still have a magnet bracelet that is a complete weapon but, cleared as a medical necessity. It is stated on the OMG that on 6/24/2021 as pursuant to Administration I was removed from medical observation. The grievance I placed about not recieving "Life Sustaining medication" because, the COs will not go out of their way. As they put it "It is not their job". John Harman stated, "it is my responsibility to be on the gate at medication distribution". For one, there is no medication distribution times. It sways from 8am-10am and 4:30pm-8:00pm, so how do I know to be ready? The stupidest thing your contracted medical care company could have done is clear me of medical observation and John Harman confirmed they did. On 9/22/2021 I had a siezure, both officers, Cleffi badge 486 and Brewer badge 494 called medical twice. No one Ever Came. In this situation ~~[illegible]~~ the ~~the~~ Contracted medical care

company Primecare is not doing its job and I am recieving wholly inadequate medical care, I just missed medications again because, officer Walker badge # 273 said "That isn't my job"

Respectfully,

August B. Kreis IV

CC.

August B. Kreis IV 10/11/2021 Civil Action No. 21-CV-2360


10/15/2021 Civil Action No. 21-cv-2360 Cell H-05
Double Bunk
Desk
left
right
left
right
August B. Kreis
Michael Gazzano
Enterance
Gate
Window
Bochini
Tiolet
Double Bunk
H-Tier "Special Needs" Northampton County Prison

ORIGINAL

COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY
COMMONWEALTH OF PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA :OTN: R130459-0
:
vs. :
:
AUGUST BYRON KREIS, IV :
:
Defendant :

PRELIMINARY HEARING

BEFORE MAGISTERIAL DISTRICT JUDGE DANIEL G. CORPORA, 700 Philadelphia Road, Suite C, Easton, Northampton County, Pennsylvania, on Monday, June 7, 2021, commencing at 9:30 a.m.

APPEARANCES:

AARON GALLOGLY, ESQUIRE
Assistant District Attorney
669 Washington Street
Easton, Pennsylvania 18042
-- For the Commonwealth

JORDAN KNISLEY, ESQUIRE
Office of the Public Defender
669 Washington Street
Easton, Pennsylvania 18042
-- For the Defendant

AUGUST BYRON KREIS
-- Pros Se

COURT REPORTER: JEAN E. GENOVA

# I N D E X

## WITNESSES


| FOR THE COMMONWEALTH: | PAGE |
| --- | --- |
| MICHAEL GAZZANO | |
| Direct Examination by Mr. Gallogly | 5 |
| Cross Examination by Defendant Kreis | 15 |
| AUGUST BYRON KREIS, IV | |
| Direct Examination | 30 |
| Cross-Examination by Mr. Gallogly | 33 |

(Due to the COVID-19 pandemic and the voluntary mask wearing by some participants in the hearing, the foregoing is being transcribed to the best of this reporter's ability.)

THE JUDGE: Good morning. We are officially here for a preliminary hearing, Commonwealth of Pennsylvania versus August Byron Kreis, IV.

Am I saying that correctly, sir, Kreis?

DEFENDANT KREIS: Kreis.

THE JUDGE: Kreis, I apologize.

Mr. Kreis, it's my understanding at this time that you're going to be waiving a right to have counsel represent you?

DEFENDANT KREIS: Yes, sir.

THE JUDGE: You applied for a Public Defender and were assigned a Public Defender, and you want to represent yourself this morning; is that correct?

DEFENDANT KREIS: Yes.

THE JUDGE: That being said, I'm going to ask you if you are knowingly, voluntarily and intelligently waiving your right

to have an attorney representing you for these proceedings?

DEFENDANT KREIS: Yes.

THE JUDGE: I'm going to have you sign the waiver of counsel form. There are four copies to sign before we begin. And one of those copies will be your copy to keep, sir.

(The Defendant signs the forms.)

THE JUDGE: With that being said, we are ready to proceed.

On the Complaint there are three charges listed. The first charge listed is aggravated assault, under 2702 subsection (a)(3). This is listed as a felony charge of the second degree.

I'm sorry there are four charges listed.

The second charge, disarming law enforcement officer, as a felony of the third degree, under Section 5104.1 subsection (a)(1).

Third charge, institutional vandalism, as a misdemeanor charge of the second degree, under Section 3307 subsection (a)(3).

And a final charge, criminal mischief, as a misdemeanor charge of the second

degree, under Section 3304 subsection (a)(5).

Is the State ready to proceed at this time?

MR. GALLOGLY: We are, Your Honor.

THE JUDGE: Call your first witness.

MR. GALLOGLY: At this time, Commonwealth would call Michael Gazzano.

MS. KNISLEY: Can I be excused, Judge?

THE JUDGE: Yes.

MS. KNISLEY: Thank you, Your Honor, have a good day.

THE JUDGE: Raise your right hand, sir.

* * *

MICHAEL GAZZANO, having been duly sworn, was examined and testified as follows:

THE JUDGE: Thank you.

* * *

DIRECT EXAMINATION

BY MR. GALLOGLY:

Q Can you state your name, spelling your last name for the record?

A Michael Gazzano, G-A-Z-Z-A-N-O.

Q And who are you employed by?
A Northampton County Prison.
Q And what is your position there?
A Correctional officer.
Q And on April 12th, 2021, were you operating in your capacity as corrections officer?
A Yeah.
Q And how were you dressed at that time?
A I'm in the same uniform I am today with my black shirt on and black pants.
Q All right.
And during that day, did you go to a prison cell that had an inmate of August Kreis?
A Yes.
Q And is he here in the courtroom today?
A Yes, he is.
Q Can you just point him out, describe an article of clothing?
A He's in our orange jumper.
MR. GALLOGLY: Your Honor, if the record could show the witness identified the

defendant.

THE JUDGE: Noted.

BY MR. GALLOGLY:

Q And what was your reason for being in that cell on that day?

A To conduct a cell search, at the request of medical.

Q And what were you specifically looking for at that time?

A At the point of the cell search, I was looking for a jug of water.

Q And why was that?

A Mr. Kreis has a CPAP machine and it has to be filled with water. When I went to fill it, medical didn't know where the jug was.

Q And so while you were -- so what happened when you went in, first went inside?

A Well we actually, at first we took the CPAP machine down, got it filled with water, and came back. And at that point I asked him, Inmate Kreis, if he has a water jug in his cell. He stated, no. I said, I'm going to have to look around the cell just to see if you have it.

At that point, I opened the cell door, he went to the left-hand side of the cell

by the toilet. And at that point, I entered into the cell.

While I was looking, I went straight back to the back of the cell to work my way forward real quick. It was a quick look around at the cell. I noticed that he had headphones conducive of using with a radio.

At that point, I asked him if he had a radio. The reason I asked him, was because he was on discipline segregation. County -- DOC policy is that anybody on discipline segregation is not allowed to have a radio.

At that point, Inmate Kreis stated that, you should have talked to your partners, they gave it to me. I said, that's neither here nor there. Do you have a radio? He stated, no.

So he was still by the left-hand side of the cell by the toilet and near the bunk, about ten, five or ten feet approximately away from the toilet. He was standing in between there.

As I went to the front of the cell, there's a desk on the right-hand side. The desk consists of four drawers -- or four doors that open. There's two on the left side, two on the

right side, and they swing outward.

I went and opened up the one on the right side. And when I went to put -- when I put my hands in it, Inmate Kreis kicked the door shut, closing my hands and slamming the door.

At that point, I immediately stood up and I, I gave him a little bit of a push to create distance, because he was hostile and aggravated at that point. And then I started to give him commands to place his hands behind his back, which he refused.

At this point, another officer came in. I had control of his right arm at this point. He backed up against the wall of the cell, between the toilet and the bunk again. And then refused to give up his arms, or resisting commands to give up his arms.

It actually ended up him sitting on the toilet itself, as we were trying to transition him to the floor. As we were going to the floor, I had my holster with my X26P Taser on. It got dislodged in his left hand. He grabbed it around the trigger of the Taser.

So when we do transition to the floor, I noticed that he had it in his left

hand. I pinned his left hand out of his body, so now he's between the desk and the bunk, and his head's in the corner kind of. The bunk's here (indicating), the desk's here (indicating), he's diagonal. My partner's working on his right hand at the time, to try to get it behind his back. And my -- I had his left hand pinned out with the Taser. He had a grip on it, his fingers were inside the trigger guard.

At that point, I give him a diffuse pressure strike to the shoulder, to try to work his hands off, all while giving commands to release the Taser.

I was able to manipulate his hands off the Taser. At that point Inmate Kreis, once I regained control of the Taser, Inmate Kreis grabbed the bunk itself, the ladder of the bunk. Well not the ladder, but the legs of the bunk, and wrapped his left arm around the bunk.

At that point, I went to actually utilize my Taser. I gave commands for him to stop resisting or he's going to be tased. I said, Taser, Taser. I went to deploy, the Taser was inoperable. The trigger of the Taser actually fell off between my partner's legs. So

I re-holstered, and started working on his arms again.

At that point, he had a good grip around the leg. My Lieutenant at this point came in, Lieutenant Rinker, and drive stunned him with his Taser. And at that point he was able to -- I was able to get his arm off of the bunk and into handcuffs.

At that point then, we flipped him onto recovery position. I searched him on the right side, searched him on the left side. My Lieutenant gave me orders to continue the search of the cell, and I found a radio underneath his bunk.

At that point then, I exited the cell and the incident was over for me.

Q All right.

And what were -- what, what hand was in the door before he kicked it?

A The right hand.

Q The right hand.

And what was the condition of the hand afterwards?

A It was just red. It was just red and sore. It went away after about a day.

Q All right.
But there was redness afterwards?
A Correct.
Q And how long would you say he had, the defendant had the Taser in his possession?
A Um ... you know, the length of down time kind of lasts longer, so it could have been a minute, minute or so before I was able to manipulate his fingers off of the Taser.
Q And you gave him commands to drop the Taser?
A Correct.
Q And did he refuse to drop the Taser?
A Correct.
Q What kind of Taser do you have?
A It's the X26P.
Q And do you provide it or is the -- does the jail provide it?
A The jail provides it.
Q All right.
And do you know how much that's worth?
A Approximately around $1500, a little bit more.

Q Okay.

And was it damaged prior to you -- do you know if it was damaged prior to it falling out?

A It was not before it. We did it -- it was spark tested to make sure it's in working order.

Q Do you know how it, how it ended up being broken?

A When he -- when his fingers were actually on the Taser, his fingers were inside of the trigger guard. So when I was manipulating them off, it ended up pulling the trigger itself off of the Taser.

Q And it was unable to be used afterwards?

A Correct. I went to deploy it and it was inoperable.

Q I am showing what I have marked Commonwealth Exhibit Number 1.

MR. GALLOGLY: May I approach, Your Honor?

THE JUDGE: Yes.

BY MR. GALLOGLY:

Q Do you recognize this photograph?

A That is the Taser I had on me that day.

Q And can you just describe what that photograph is showing?

A It's showing that the trigger is actually off of the Taser itself. So in the, in the trigger guard there should -- this black piece (indicating) should be right there to engage the mechanism in the Taser. And it came off while we were wrestling for it.

Q And that photograph's an accurate representation of the Taser after this event?

A Yes.

Q Thank you.

MR. GALLOGLY: Your Honor, I'll move for admission of Commonwealth's Exhibit 1.

THE JUDGE: Any objection?

DEFENDANT KREIS: (Nodded negatively.)

THE JUDGE: Thank you.

MR. GALLOGLY: Thank you, no further questions.

THE JUDGE: Any cross examination, sir, of this witness?

DEFENDANT KREIS: Yes. I was just

going to ask you, Your Honor, it's your courtroom, I was going to ask you if you wanted me to read the whole citation number, just the one law that I wanted to read before.

THE JUDGE: This is just cross examination at this point of this witness.

DEFENDANT KREIS: Okay, all right.

THE JUDGE: Do you have any questions of this witness?

DEFENDANT KREIS: I understand completely.

* * *

CROSS-EXAMINATION

BY DEFENDANT KREIS:

Q So you already confirmed, you know, about the CPAP machine. You, you already confirmed that you know exactly what that -- you know what it was for, is what I'm saying, Mr. Gazzano; right? That you went down to take care of this with medical, and they sent you back up to search? You understand that one?

A Correct.

Q Okay.

Now have you ever seen this (indicating) before?

A I have not.

Q You've never seen this (indicating)?

A No.

Q You've never seen it being cleared on DS status that I am allowed to have something of this nature in -- excuse me -- in my cell?

A I've never seen you wear that, sir.

Q You've never seen that before?

A No.

Q Okay, all right, that's -- yes, sir.

Um ... and I wanted to let you know that every question that I ask to anybody who I call as a witness, that it's either yes, no, or I don't know. Those are the only three answers that you can give.

MR. GALLOGLY: Just ask a question.

DEFENDANT KREIS: And that's perfectly fine. I was just stating, that's all.

BY DEFENDANT KREIS:

Q So, is it fact that you stayed strict to codified administrative protocol during your shift of duty?

A Yes.

Q Yes?

A Yes.

Q Okay, you're just -- that's all, that is all.

Is it fact when you were arm barring me ninety degrees to the left and my head was 12:00 o'clock to the unit cell desk, that you slammed it into the desk?

A No.

Q Okay.

That the corrections officer does not have -- is it fact that the corrections officer does not have to tell the inmate why or for what the acts of a CR are being -- CO are being made, but communication to an inmate greatly reduces the possibility of escalation of the situation?

A Could you repeat that question?

Q All right, if you'd like me to, sir.

I said, is it a fact that a corrections officer does not have to tell the inmate why or for what the actions of the corrections officer are being made, but communication does greatly reduce the

possibility of escalation of the situation? Yes, no, I don't know?

A Your first part is, yes. The second part of the question is objective.

Q For the de-escalation or the amount of escalation of a situation, is that what you're referring to?

A That's exactly --

THE COURT REPORTER: Wait, that's exactly?

THE WITNESS: Objective, situation-by-situation.

DEFENDANT KREIS: Okay, so he means situation-to-situation, everything is different, ma'am. That's what he's stating.

BY DEFENDANT KREIS;

Q Is it fact that the corrections officer only needs to establish themselves in the way of initial presence?

A Yes.

Q Okay.

Is it fact that you are not certified and able to conduct investigations nor enforce the law of this Commonwealth?

MR. GALLOGLY: Objection to the

relevance of the question.

DEFENDANT KREIS: They're all leading into each other, Your Honor.

THE JUDGE: I'll sustain that objection. You can ask other questions and see where they go, but that question's not relevant to what we're here for today.

DEFENDANT KREIS: I understand, Your Honor.

BY DEFENDANT KREIS:

Q Is it a fact that in your own words in the formal misconduct of 4/12/2021, at 710 hours, that I grabbed control of the Taser after it became dislodged off the holster, as you were using excessive force to restrain me?

MR. GALLOGLY: I'm going to object to that question. It describes it as excessive force. It's a legal conclusion there.

THE JUDGE: I'm going to sustain the objection of the question as it's asked.

BY DEFENDANT KREIS:

Q Is it fact, Mr. Gazzano, that I allegedly slammed the left cabinet door on the right side of the cabinet, quote, intentionally or knowingly, end quote, while your attention

and flashlight were in the right cabinet, and which caused immediate pain?

A Yes. My flashlight wasn't there, though. It was my hand.

Q Okay.

Mr. Gazzano, is it fact that this caused the use of your fingers resulting in you standing, turning ninety degrees to your left, and slamming me in the chest with both hands, causing me to stumble backwards and hit my head on the outer corner of the bunk, and you striking recent nerve surgery, which there is, you know, there it is (indicating), for my epilepsy, that's what that's for. That is for the implant, sir. While stating, quote, mother fucker, end quotes.

DEFENDANT KREIS: I apologize for swearing in your courtroom, Your Honor.

THE JUDGE: That's fine.

THE WITNESS: No, you didn't fall back and strike your head. I pushed you to create distance, since you were --

BY DEFENDANT KREIS:

Q And you never stated that?

A Never stated that?

Q You never stated, you never stated mother fucker, as you were doing that?

A I did not.

Q You did not?

A I did not, no.

Q Okay.

Mr. Gazzano, is it fact that as of April 12th of 2020, that my disabilities were aware to everyone within the, within the Corrections Department, and that you acted in, quote, deliberate indifference by your actions?

MR. GALLOGLY: Object to that, to the entirety of the question. You can ask if it was known about his medical condition, but I don't know where this deliberate indifference is coming from.

THE JUDGE: Again, you can re-ask that question. I'm going to sustain the objection. There are parts of it that are probably answerable, parts that probably aren't.

BY DEFENDANT KREIS:

Q Is it fact, Mr. Gazzano, that by your actions, you were acting in deliberate indifference to my life?

MR. GALLOGLY: I'm going to object

to that, because that's the part of the question that was objectionable.

THE JUDGE: That part of the question I'm going to sustain the objection.

DEFENDANT KREIS: Okay. How could I re-word that.

BY DEFENDANT KREIS:

Q Mr. Gazzano, is it just by the fact of the way you conducted yourself that it was in excessive manner, that it was not needed, per the situation?

MR. GALLOGLY: I'm going to object to that as well. I mean, it's still asking for the same thing.

THE JUDGE: I'll sustain the objection.

DEFENDANT KREIS: Yeah, I'll move on, Your Honor.

BY DEFENDANT KREIS:

Q And every one of these questions, as noted, is because of the medical groundings of everything, because of my medical disabilities.

THE COURT REPORTER: The medical what of everything?

DEFENDANT KREIS: The medical adequacy of the situation and how it was handled.

THE JUDGE: Mr. Kreis, this is a preliminary hearing to determine whether or not a crime was committed. Not for some of what you're getting into in some of the questions.

DEFENDANT KREIS: So you're just sustain -- you're sustaining?

THE JUDGE: When I hear the term --

DEFENDANT KREIS: It's not a trial.

THE JUDGE: Exactly.

DEFENDANT KREIS: It's a hearing.

THE JUDGE: Exactly.

DEFENDANT KREIS: Okay, Your Honor, okay.

BY DEFENDANT KREIS:

Q Now, Mr. Gazzano, is it fact that when you were restraining me, when you were restraining me, and you moved positions, like you said, you did get my right hand into a handcuff, you did. And when you were moving positions to gain control and restrain my left hand, that the Taser became dislodged and fell to the floor?

A No, negative. That's not the way it happened.

Q That's not the way it happened, sir?

A No.

Q Okay, okay.

So, Mr. Gazzano, why in your write-up, the misformal -- you know, the actual write-up you gave me for the situation -- I apologize, Your Honor -- why is it fact that the wording in the misconduct does not add up to the -- I'm not Latin, Your Honor, I am not an attorney, I apologize if I pronounce anything wrong.

THE JUDGE: That's okay.

BY DEFENDANT KREIS:

Q Why is it the fact that the information on the misconduct does not add up to Mr. Horvath's information with the four corners of that Affidavit?

A I haven't personally seen the Affidavit.

Q Because I do have, I do have both, and --

DEFENDANT KREIS: May I present

that to you, Your Honor?

THE JUDGE: What are you presenting to me?

DEFENDANT KREIS: The wording in how it actually happened and what he even stated himself, compared to what was stated in the Statute I wrote.

THE JUDGE: Now what is it? What is it; a document?

DEFENDANT KREIS: It's a document, it's a document. I apologize, Your Honor.

THE JUDGE: Please allow the District Attorney to view it first, before I take a look at it.

DEFENDANT KREIS: Give it to the?

THE JUDGE: (Nodded affirmatively.)

DEFENDANT KREIS: Okay.

That is his formal misconduct, the write-up of it.

(The document is review by the District Attorney and the Judge.)

THE JUDGE: Do you want to read this, sir? Do you have questions regarding this document now, sir?

BY DEFENDANT KREIS:

Q So my only question to you, Mr. Gazzano, is, if I grabbed it from you when I wasn't already on the floor, why doesn't it state it in any way, shape, or form related to that in your own words?

A It says, Inmate Kreis then gained control of the officer's duty weapon after it became dislodged from the holster and refused to let it go.

Q Ah-ha. After it became dislodged.

A Correct.

Q Okay?

A Okay.

Q Now, everything that you had stated before about how me going back to the wall and never getting arm barred down to the floor directly, that's not even true.

MR. GALLOGLY: I'm going to object. That's an argumentative question.

THE JUDGE: Sustained.

BY DEFENDANT KREIS:

Q And you, you agree that, what is it, Lieutenant Rinker, badge 36, he was the officer who came, the commanding officer who

came to the situation?

A Yes.

Q Okay.

Now on his video, on his body cam, it will show it did drive tas me once, directly in my back, whatever, middle of my back, and that is when I released the Taser. You never regained controlled of that Taser until after he tased me, and that should all be on body-cam footage.

A That's false.

Q Okay.

So that is false, he will not have that on body-cam footage?

A When Lieutenant Rinker entered the cell, I already had my Taser, I already had the Taser re-holstered. You had your left arm around the bunk. The reason you got drive stunned is because you wouldn't let go of the, of the leg of the, of the bunk.

So the reason that we had -- the reason that Lieutenant Rinker had to drive stun you is because you were refusing orders to place your hands behind your back.

Q Well, the only reason I'm asking

you the question about how it's worded in that misconduct, Mr. Gazzano, is because, Mr. Gazzano, it says in here of the information in which -- how I broke a Statute, the official Statute being indicted against me, it says that I removed or attempted to remove a weapon off of a corrections officer. That my actions are that I pulled it off of our duty belt.

A Correct.

Q But that is not what comes from -- comes forth from that misconduct. It doesn't say I grabbed it off of your duty belt, sir.

A I'm not sure how to answer that with a yes or no.

Q So I did, so I did not grab it from your duty belt?

A You did.

Q I did grab it from your duty belt?

A When it became dislodged, correct.

DEFENDANT KREIS: Okay, all right, that's enough of that, Your Honor.

THE JUDGE: Thank you. No further questions?

DEFENDANT KREIS: He answered it, that's fine.

THE JUDGE: Any redirect?

MR. GALLOGLY: No redirect, Your Honor.

THE JUDGE: Thank you, sir, you may step down.

Any other testimony from the State at this time?

MR. GALLOGLY: No additional testimony. The Commonwealth would rest.

THE JUDGE: Thank you.

At this time, sir, you are able to provide testimony on your own behalf. You do not need to do so at the preliminary hearing. Any testimony you do provide, could later be used against you at a court, at a subsequent hearing.

That being said, do you wish to offer any testimony today?

DEFENDANT KREIS: Yes, I would. I have no reason to ...

THE JUDGE: As best you can, I'll ask you to please raise your right hand.

* * *

AUGUST BYRON KREIS, IV, having been duly sworn, was examined and testified as follows:

THE JUDGE: Thank you.

What would you like to tell the Court?

* * *

DIRECT EXAMINATION

DEFENDANT KREIS: That it was roughly 6:10 in the morning when I did, I had asked him to get the water. And they went down and medical, which shouldn't even be something he should have to worry about, medical couldn't find that jug. And that's -- they did direct him to come back and come into the cell and search for it.

And while he was searching for it, I asked him multiple times what was going on, because I was on -- I was already on disciplinary segregation, and I didn't understand why they were entering the cell. And he was acting in an aggressive manner.

And normally an inmate on DS, I should have, I should, on my status, been on E-Tier in the hole. And any time there's a

search in a cell, you get re -- you get handcuffed and same thing as this (indicating), in a belt, Your Honor, and removed from the cell and everything. And I was just confused as to what was going on, and why he was agitated.

And I did not find out about that jug of water until after it was all over. Until it was completely over. And I had asked him many times. If Mr. Bochini was here, I would cross examine and ask him, well is that not true to the best of your knowledge that I asked over, and over, and over again why this was happening, because I was just confused.

And he had opened the both drawers on the left side of the desk. I had closed them with my foot. And then when he was in the last one closest to the gate; so what is that? The right side, the right side cabinet, Your Honor, of the right side of the desk. And he had already been in the left one. I closed that with my foot, I did not slam it shut.

And he immediately stood, turned ninety degrees to his left and, you know, facing me then at his 12:00, and he slammed me backwards in the chest, slamming on this

(indicating) implant for my severe epilepsy, which caused substantial pain. And my head hit the corner of the bunk.

And as far as taking an aggressive stance? It was more defensive, because I was just stunned what he just did. And he was making the action to slam me backwards in the chest with so much force -- I'm sorry, Your Honor, these things (indicating) are annoying. -- that's when he stated, quote, mother fucker.

And by the time the code was called, I was already on the ground and cuffed on my right hand. Nobody helped him take me to the -- he had to do that on his own, because a shadowing officer cannot get involved. And Bochini was his shadowing officer that day.

And I did not let go of that Taser until way after when he is, when he is putting his testimony in about.

THE JUDGE: Anything further?

DEFENDANT KREIS: No. Just when he was, just when he was taking me down and hitting the desk, and hitting the corner of that bunk, that just put me in fear of my life, of my disabilities. Because it does only take one

seizure to die.

THE JUDGE: Thank you, sir.

Any cross examination?

* * *

CROSS-EXAMINATION

BY MR. GALLOGLY:

Q So you admit to kicking the door with your foot?

A I pushed it closed with my foot.

Q But you used your foot to shut the door?

A Yes, I did.

Q All right.

And you held onto the Taser?

A Yes.

Q And did you hear commands to release the Taser?

A Yes, I did.

Q And you did not release the Taser?

A No, I didn't. And the Taser is broken on my, on my actions.

MR. GALLOGLY: Thank you, no further questions.

THE JUDGE: Anything in closing, any closing argument, sir?

DEFENDANT KREIS: I actually did write something up that was a closing argument, but I don't -- it's your courtroom, Your Honor. If I'm allowed to read this?

THE JUDGE: It's closing argument, you have an opportunity to present it.

DEFENDANT KREIS: It's your courtroom, Your Honor. So I'll let you -- whatever you command to do.

It says, you see, comes down to one major problem within the NCP facilities. Standard trained procedure, which has been codified by administration for the use of discretion in handling similar situations and equal protections for facility's staff, because we can't have people hurting you guys, or for hurting me. And I'm a pretrial detainee. I haven't even been convicted to the fullest extent of due process of law.

So we're not -- that's why we can't be beating on each other. And I was in fear for my life because of the actions which were made. It just -- you're not to go slamming your head off things when you have epilepsy, Your Honor. That is what I mean.

That you cannot have security entity correctional staff follow or break procedure when they feel like following it or not, and expect the outcome of equal treatment of similar instances. Like you said, everything is a -- it's all circumstantial.

And the remove of inmates of a housing unit is not mandatory. But in the situation that I said, everything changes, Your Honor, from person-to-person and shift-to-shift on their discretion of how they want to exercise power changes. And that's one reason that the confusion on my end came up very easy, because it was just way different. It was totally different. And that's why I was asking what was going on.

But second shift does that at their discretion, to avoid incidents like the one at hand. Substance in regarding in the inmates and corrections staff are not off video camera recording together, resulting in the ability resulting -- excuse me -- in the ability for conflict of parties or accusations.

As a result, you get told to exit willingly or willingly restrained on DS. If you

refuse to do so, the CO calls the Lieutenant on, on shift, like you would normally, calls the Lieutenant on shift, and they do not enter the cell to handle the situation and/or incident without everything being video and audio recorded by the Lieutenant's body cam.

So in this result, no one goes off of video recording until the Lieutenant is there and present.

Everything by an inmate or staff is undeniably on recording. And the corrections officers are trained on the use of discretion and the use of authority over life of that discretion.

The way the individuals of second shift use discretion in doing there duty, is understandable and very professional. And you cannot, you can't expect privacy in a jail facility. There is no such thing. Shakedowns can be done whenever they want, if they want, if they don't want to. It's just the environment of an authoritative environment as a jail. So it has nothing to do with that. Nothing.

My only argument is on the way things were handled and the way things were

done, Your Honor.

THE JUDGE: Thank you.

Any closing, sir?

MR. GALLOGLY: Yes, just briefly.

Just going through the charges, 2702(a)(3), aggravated assault, attempts or causes or intentionally or knowingly causes bodily injury to any officers, agents, employees or other persons enumerated in Subsection (c), in the performance of duty.

Subsection (c)(9) includes officers or employee of a correctional institution, county jail or prison.

I believe the testimony here, that the corrections officer had his hand inside of the door, and the defendant did use his foot to shut it, or kick it, or any manner which causes redness and therefore injury.

Going to 5104.1, disarming law enforcement officer, (a)(1), without lawful authorization, removes or attempts to remove a firearm, rifle, shotgun or weapon from a person of a law enforcement officer or corrections officer, or deprives a law enforcement officer or corrections officer of the use of a firearm,

rifle, shotgun or weapon, when the officer's acting within the scope of the officer's duties and has reasonable cause to know or knows that the individual is a law enforcement officer, corrections officer.

I believe even the defendant's own statement is that when he was given commands to drop the Taser he did not. He deprived the officer of that, even in his own version, the defendant's own version of events. He was already known to be a corrections officer. He was operating in his capacity as a corrections officer. And was dressed as such.

And then for institutional vandalism, and criminal mischief, I won't read those Statutes, but the defendant admitted to breaking the Taser, which was valued at $1500.

Therefore I believe prima facie has been met and I would request that these charges be held for court.

THE JUDGE: Thank you.

At this time, based on the parameters of a preliminary hearing, I will be holding all charges over for court at the County level.

That being said, your next hearing will be your formal arraignment. It is pre-scheduled for September 16th, 2021. It will be at held at 9:00 o'clock a.m., more likely on video arraignment over at County Court.

Before you leave here today I will give you written notice of a date and time of that hearing. The notice you receive today will be the only notice you will receive.

That being said, we are concluded here this morning.

* * *

(Proceedings concluded.)

CERTIFICATION

I HEREBY CERTIFY that the proceedings are contained fully and accurately in the notes taken by me in the above cause, and that this is a correct transcript of the same.

Date: June 18, 2021

JEAN E. GENOVA
Court Reporter

My DS time for the incident of 4/12/2021 ended on 9/17/2021, then because of Corrections Officer Douglas badge 476 abusing the behavioral System I ended up recieving another 45 days consecutive for an empty food tray falling off the wicket on 8/24/2021 by John Harmon. On 9/22/2021 I had a siezure and both Officers working the tier, Officers Brewer 494 and Officer Cleffi 406 called medical multiple times. No One from medical ever even came to see me. The misconduct of 8/24/2021 was investigated by John Kleinman and the appeal was denied as a result of the Lts Office confirmed the tray was thrown. I spoke with Officer Joshua A. Plum badge 274 on 9/27/2021 at 1:40am and he confirmed that the tray was not thrown from the cell

10/19/2021 Civil Action No: 21 CV-2360

10/9/2021 Civil Action No. 21-CV-2360

by stating "I know it was an accident and fell. It hit my leg at my boot. I wasn't even going to even write you up for that. I only did it because, Officer Douglas told the Lts Office it was and he wrote that misconduct for me to sign to cover my ass" As a direct result I have spent more time on DS on E-Tier with inadequate medical care. Obviously Plum is going to tell the Lts Office I did it on purpose after writing and signing an unneseccary Misconduct that was to cover his ass. I get close to no medical care on E-Tier.

Respectfully
August B. Frain IV

cc.

To whom it may concern, 10/9/2021

I am writing you do to the lack of adequate medical care in Northampton County Prison and the actions of the Primecare employees in this facility. On 9/22/2021 I had a siezure and NO ONE From medical ever even came to see me or check my vitals. I have been ignored by Primecare staff in this facility since out of abuse of Power and deliberate Indifference, Physicians Assistant Polina and Medical Administrator Jenn Keller "cleared me" of "Medical Observation" despite the Knowledge of me having severe OSA with use of a CPAP and severe epilepsy with VNS implant therepy. Allowing me to be placed completely unmonitored against St. Lukes MD's order, on E-Tier "The Hole". DS classification changes priviledges not medical needs. DON Shane P. Caffery Failed to reorder my "Life sustaining medications" on 7/24-7/27, 2021 and it caused two siezures. Primecare employee LPN "Nicki" just distributed evening medication and I asked for a grievance, about the above stated incodents and she refused it, stated "Can he prove it?" laughed and walked away. Denying me the grievance.

Respectfully,
August B. Davis IV

cc.

10/9/2021 Civil Action No. 21-CV-2360

August B. Kreis IV

# COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY

## DOCKET



Docket Number: CP-48-CR-0001466-2021

# CRIMINAL DOCKET

Court Case

Commonwealth of Pennsylvania
v.
August Byron Kreis IV



## CASE INFORMATION

Judge Assigned:

Date Filed: 06/09/2021 Initiation Date: 04/20/2021

OTN: R 130459-0 LOTN:

Originating Docket No: MJ-03206-CR-0000070-2021

Initial Issuing Authority: Daniel G. Corpora

Final Issuing Authority: Daniel G. Corpora

Arresting Agency: Northampton County District Attorney's Office

Arresting Officer: Horvath, Charles

Complaint/Citation No.:

Incident Number: 21023

Case Local Number Type(s)

Case Local Number(s)

## STATUS INFORMATION

Case Status: Active

Complaint Date: 04/20/2021

| Status Date | Processing Status |
|---|---|
| 09/16/2021 | Awaiting Trial |
| 06/09/2021 | Awaiting Formal Arraignment |
| 06/09/2021 | Awaiting Filing of Information |

## CALENDAR EVENTS

| Case Calendar Event Type | Schedule Start Date | Start Time | Room | Judge Name | Schedule Status |
|---|---|---|---|---|---|
| Formal Arraignment/Pretrial Conference | 09/16/2021 | 9:00 am | Courtroom 1 | | Scheduled |
| Pre-Trial Conference | 10/27/2021 | 9:00 am | Courtroom 1 | President Judge Michael J. Koury Jr. | Scheduled |
| Criminal Court | 11/30/2021 | 9:00 am | Courtroom 1 | | Scheduled |

## CONFINEMENT INFORMATION

| Confinement Known As Of | Confinement Type | Destination Location | Confinement Reason | Still in Custody |
|---|---|---|---|---|
| 11/09/2020 | County Correctional Facility | Northampton County Prison | | Yes |

## DEFENDANT INFORMATION

Date Of Birth: 02/01/1988 City/State/Zip:

Alias Name
Kreis, August Byron

## CASE PARTICIPANTS

| Participant Type | Name |
|---|---|
| Defendant | Kreis, August Byron IV |



Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY

## DOCKET



**Docket Number: CP-48-CR-0001466-2021**

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
August Byron Kreis IV



## BAIL INFORMATION

**Kreis, August Byron IV**

**Nebbia Status: None**

| Bail Action | Date | Bail Type | Percentage | Amount | Bail Posting Status | Posting Date |
|---|---|---|---|---|---|---|
| Set | 04/22/2021 | Monetary | | $10,000.00 | | |

## CHARGES

| Seq. | Orig Seq. | Grade | Statute | Statute Description | Offense Dt. | OTN |
|---|---|---|---|---|---|---|
| 1 | 1 | F2 | **18 § 2702 §§ A3** | Aggravated Assault - Attempts to cause or causes BI to designated individuals | 04/12/2021 | R 130459-0 |
| 2 | 2 | F3 | **18 § 5104.1 §§ A1** | Disarming Law Enforcement Officer - Without Lawful Authorization | 04/12/2021 | R 130459-0 |
| 3 | 3 | M2 | **18 § 3307 §§ A3** | Institut'l Vand'ism Educ Facil | 04/12/2021 | R 130459-0 |
| 4 | 4 | M2 | **18 § 3304 §§ A5** | Criminal Mischief - Damage Property | 04/12/2021 | R 130459-0 |

## DISPOSITION SENTENCING/PENALTIES

Disposition
Case Event — Disposition Date — Final Disposition
Sequence/Description — Offense Disposition — Grade — Section
Sentencing Judge — Sentence Date — Credit For Time Served
Sentence/Diversion Program Type — Incarceration/Diversionary Period — Start Date
Sentence Conditions

**Held for Court (Lower Court)** Defendant Was Present

| Sequence/Description | Offense Disposition / Date | Grade | Section |
|---|---|---|---|
| Lower Court Disposition | 06/07/2021 | Not Final | |
| 1 / Aggravated Assault - Attempts to cause or causes BI to designated individuals | Held for Court (Lower Court) | F2 | 18 § 2702 §§ A3 |
| 2 / Disarming Law Enforcement Officer - Without Lawful Authorization | Held for Court (Lower Court) | F3 | 18 § 5104.1 §§ A1 |
| 3 / Institut'l Vand'ism Educ Facil | Held for Court (Lower Court) | M2 | 18 § 3307 §§ A3 |
| 4 / Criminal Mischief - Damage Property | Held for Court (Lower Court) | M2 | 18 § 3304 §§ A5 |

**Proceed to Court** Defendant Was Not Present

| Sequence/Description | Offense Disposition / Date | Grade | Section |
|---|---|---|---|
| Information Filed | 09/14/2021 | Not Final | |
| 1 / Aggravated Assault - Attempts to cause or causes BI to designated individuals | Proceed to Court | F2 | 18 § 2702 §§ A3 |
| 2 / Disarming Law Enforcement Officer - Without Lawful Authorization | Proceed to Court | F3 | 18 § 5104.1 §§ A1 |
| 3 / Institut'l Vand'ism Educ Facil | Proceed to Court | M2 | 18 § 3307 §§ A3 |
| 4 / Criminal Mischief - Damage Property | Proceed to Court | M2 | 18 § 3304 §§ A5 |



Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY

## DOCKET



**Docket Number: CP-48-CR-0001466-2021**

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
August Byron Kreis IV



## COMMONWEALTH INFORMATION

Name: Aaron Matthew Gallogly
Assistant District Attorney
Supreme Court No: 318976
Phone Number(s):
610-829-6628 (Phone)
Address:
Northampton County Da's Office
669 Washington St
Easton, PA 18042

## ATTORNEY INFORMATION

Name: Jordan Amanda Knisley
Public Defender
Supreme Court No: 320571
Rep. Status: Active
Phone Number(s):
610-759-7600 (Phone)
Address:
8 N Main St
Nazareth, PA 18064
Representing: Kreis, August Byron IV

## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| 1 | 04/22/2021 | | Corpora, Daniel G. |
| Bail Set - Kreis, August Byron IV | | | |
| 1 | 05/14/2021 | | Knisley, Jordan Amanda |
| Entry of Appearance | | | |
| 1 | 06/09/2021 | | Court of Common Pleas - Northampton County |
| Original Papers Received from Lower Court | | | |
| 1 | 06/17/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 06/17/2021 | Interoffice | | |
| 1 | 06/23/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 06/24/2021 | Interoffice | | |
| 2 | 06/23/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 06/24/2021 | Interoffice | | |
| 1 | 07/06/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |



Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY

## DOCKET



Docket Number: CP-48-CR-0001466-2021

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
August Byron Kreis IV



## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|
| Service To | Service By | | |
| Issue Date | Service Type | Status Date | Service Status |
| Kreis, August Byron IV | | | |
| 07/07/2021 | Interoffice | | |
| 1 | 07/21/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 07/21/2021 | Interoffice | | |
| 1 | 08/04/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 08/05/2021 | Interoffice | | |
| 1 | 08/24/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 08/24/2021 | Interoffice | | |
| 1 | 09/02/2021 | | Northampton County Clerk of Courts |
| Criminal Court Scheduled 11/30/2021 9:00AM | | | |
| 1 | 09/08/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |
| Kreis, August Byron IV | | | |
| 09/13/2021 | Interoffice | | |
| 1 | 09/14/2021 | | Commonwealth of Pennsylvania |
| Information Filed | | | |
| 1 | 09/16/2021 | | Court of Common Pleas - Northampton County |
| Arraigned | | | |
| 2 | 09/16/2021 | | Northampton County Clerk of Courts |
| Pre-Trial Conference Scheduled 10/27/2021 9:00AM | | | |
| 1 | 09/28/2021 | | Kreis, August Byron IV |
| Pro Se Correspondence | | | |



Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

# COURT OF COMMON PLEAS OF NORTHAMPTON COUNTY

## DOCKET



**Docket Number: CP-48-CR-0001466-2021**

**CRIMINAL DOCKET**

**Court Case**

Commonwealth of Pennsylvania
v.
August Byron Kreis IV



## ENTRIES

| Sequence Number | CP Filed Date | Document Date | Filed By |
|---|---|---|---|

## CASE FINANCIAL INFORMATION

Last Payment Date: Total of Last Payment:

| **Kreis, August Byron IV** Defendant | Assessment | Payments | Adjustments | Non Monetary Payments | Total |
|---|---|---|---|---|---|
| **Costs/Fees** | | | | | |
| Miscellaneous Issuance County (Northampton) | $19.00 | $0.00 | $0.00 | $0.00 | $19.00 |
| Server Fee - Referred to County | $58.50 | $0.00 | $0.00 | $0.00 | $58.50 |
| Server Fee - Referred to County | $64.10 | $0.00 | $0.00 | $0.00 | $64.10 |
| Costs/Fees Totals: | $141.60 | $0.00 | $0.00 | $0.00 | $141.60 |
| Grand Totals: | $141.60 | $0.00 | $0.00 | $0.00 | $141.60 |

** - Indicates assessment is subrogated



Recent entries made in the court filing offices may not be immediately reflected on these docket sheets. Neither the courts of the Unified Judicial System of the Commonwealth of Pennsylvania nor the Administrative Office of Pennsylvania Courts assume any liability for inaccurate or delayed data, errors or omissions on these reports. Docket Sheet information should not be used in place of a criminal history background check which can only be provided by the Pennsylvania State Police. Moreover an employer who does not comply with the provisions of the Criminal History Record Information Act may be subject to civil liability as set forth in 18 Pa.C.S. Section 9183.

10/7/2021 21CV2360 August B. [signature] IV

Clerk of Court Criminal Division, 9/24/2021

As Pursuant to the Freedom of Information Act and 902(a) of the Right to Know Law, I Respectfully Request an updated Docket for the following Docket Numbers: 783-2021, 784-2021 and, 1466-2021. Thank you,

2021 SEP 28 P 1:37
CLERK OF COURTS
CRIMINAL DIVISION
NORTHAMPTON COUNTY, PA

Respectfully,
August D. Kreis IV

10/7/2021 21-CV-2360 August B. Kreis III

August Kreis

#0005264

E13

August B. Kreis IV
Inmate # 5264
Northampton County
Northampton County Jail
666 Walnut Street
Easton, PA 18042







Legal Mail

RECEIVED
OCT 22 2021

U.S.M.S.

U.S. POSTAGE PITNEY BOWES
ZIP 18042 $ 007.95⁰
02 4W
0000379641 OCT. 20 2021

Clerk of Court, EDPa
James A. Byrne U.S. Courthouse
Room 2609
601 Market Street
Philadelphia, PA 19106

**INMATE MAIL**
This correspondence is from a County Jail and the sender is an inmate. The contents have not been evaluated. Northampton County Jail is not responsible for the contents or debts incurred.